(No. 73042.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LARRY WINSETT, Appellee.

*Opinion filed November 19, 1992.—Rehearing denied February 1, 1993.*

Roland W. Burris, Attorney General, of Springfield, and Michael J. Waller, State's Attorney, of Waukegan (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Karen Alice Kloppe, Assistant Attorneys General, and Kenneth R. Boyle, John X. Breslin and Rita Kennedy Mertel, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Stephen Omolecki, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

Fred E. Inbau and Wayne W. Schmidt, of Chicago, and James P. Manak, of Glen Ellyn (Bernard J. Farber, of Chicago, of counsel), for *amici curiae* Americans for Effective Law Enforcement, Inc., *et al.*

JUSTICE BILANDIC delivered the opinion of the court:

The defendant, Larry Winsett, was convicted following a jury trial in the circuit court of Lake County of attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4), solicitation of murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—1(a)), and conspiracy to commit murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a)). He was sentenced to concurrent terms of 14, 40, and 40 years' imprisonment. The defendant's convictions and sentences were affirmed on direct appeal. (*People v. Winsett* (1986), 147 Ill. App. 3d 1161 (unpublished order under Supreme Court Rule 23).) The defendant subsequently filed a petition for post-conviction relief, claiming that he was deprived of the effective assistance of counsel on direct appeal. Following an evidentiary hearing, the circuit court denied the defendant's post-conviction petition. The appellate court reversed the judgment of the circuit court, reversed the defendant's convictions and sentences and remanded the cause for a new trial. (222 Ill. App. 3d 58.) We allowed the State's petition for leave to appeal (134 Ill. 2d R. 315).

## STATEMENT OF FACTS

Due to the nature of the issue raised in this appeal, it is necessary to discuss the prior history and the facts of this case in some detail.

### Motion to Suppress

The defendant was indicted on April 10, 1985, for the

offenses of attempted murder, conspiracy to commit murder and solicitation of murder stemming from the shooting of Arturo Zarinana. On April 18, 1985, the trial court held a hearing on the defendant's motion to suppress statements he made to the police. The evidence at the suppression hearing established that the defendant was arrested at his home on February 20, 1985, pursuant to a warrant charging him with conspiracy to commit murder. Two plain-clothes detectives from the Waukegan police department and two plain-clothes police officers from the Round Lake Beach police department arrived at the defendant's home at approximately 5 p.m. as the defendant and his family were eating dinner. The detectives asked the defendant to step into the living room, informed him of the warrant, and placed him under arrest. The defendant immediately told one of the detectives, "I want a lawyer." The defendant then turned his head toward his wife, who had followed the officers into the living room, and said, "Call Bajko," who was the defendant's attorney. The defendant's six children, sister-in-law, brother-in-law, and nephew, who were standing in the doorway between the adjoining dining room and the living room, overheard this conversation.

As the detectives took the defendant from the house to their unmarked police cars, the defendant again told his wife to "call Bajko." The defendant's wife asked the officers what would happen to her husband. The officers informed her that the defendant would be permitted to phone her after he was booked and that they were taking defendant to the Lake County Building, which houses the Lake County sheriff's office. After waiting a half-hour without hearing from her husband, the defendant's wife called the Lake County sheriff's office, which had no record of the defendant's arrest. The Lake County sheriff's office informed the defendant's wife

that it occasionally performed arrests for other departments and advised her to wait another half-hour and to call it again. During that time, the defendant's wife called attorney Bajko's office, but there was no answer. She then called the Lake County sheriff's office again, and was advised to call other local police departments in the area to locate her husband, which she did without success. The defendant's wife again contacted the Lake County sheriff, who offered to attempt to locate defendant.

The defendant's wife then called the local junior college, at which attorney Bajko taught and where the defendant had met him. Although attorney Bajko was not at the college that evening, the receptionist took the defendant's wife's name and phone number and attempted to relay a message to attorney Bajko after learning of the nature of the emergency that existed. The receptionist testified that after several unsuccessful attempts, she eventually reached attorney Bajko, who then contacted the defendant's wife.

The defendant testified that he was taken to the Waukegan police station, where he was placed in an interview room. His handcuffs were removed, and his personal property was inventoried. He was then read his *Miranda* rights. The officer who read him his rights completed a waiver form, including the time, and made check marks on the form as the defendant indicated that he understood each right. Defendant refused to sign the waiver, however, and told the officer that he was unwilling to answer questions or make statements until he spoke with his attorney. The officers nevertheless continued to question the defendant for approximately 2 to 2½ hours. During this period of time, the defendant asked to speak with his attorney on three separate occasions. Defendant eventually made inculpatory statements. In his statement, the defendant identified Glen Spruille as

his accomplice. After making his statement, the defendant was again presented with the waiver form to sign, at which time he did so. The defendant was then permitted to call his wife. His call was made at 8:35 p.m. as indicated on their telephone bill. The defendant's wife then contacted attorney Bajko, who later arrived and advised the defendant not to sign the statement.

Each of the four officers who participated in the defendant's arrest denied that the defendant asked for an attorney at his home, either in the living room or as he was leaving the house. The Waukegan officers testified that they told the defendant's wife that he was being taken to the Waukegan police station. The officer who read the defendant his rights testified that the defendant signed the waiver form immediately after he was informed of his *Miranda* rights. Both Waukegan officers testified that the defendant did not at any time request an attorney during their questioning. They also testified that the defendant was not advised that he could make a phone call, but was permitted to do so after he specifically asked to call his wife.

After hearing the testimony at the suppression hearing, the court found that the defense witnesses, who included the defendant, his wife, his two teenage daughters and his sister-in-law, were "extremely credible." The court then granted the defendant's motion to suppress his statements because they were given after the defendant had requested counsel. (See *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) The court specifically found, however, that the defendant's statements were not involuntary for purposes of possible impeachment under *Harris v. New York* (1971), 401 U.S. 222, 225-26, 28 L. Ed. 2d 1, 4-5, 91 S. Ct. 643, 645-46.

## Motion *In Limine*

On May 28, 1985, the defendant filed a motion *in limine* to exclude evidence obtained as a result of his statements. Specifically, the defendant sought to prohibit the State from presenting Glen Spruille's testimony implicating the defendant at trial. The defendant claimed that Spruille's identity and testimony should be excluded at trial under the "fruit of the poisonous tree" doctrine. That doctrine may be invoked where the police violate a defendant's constitutional rights, for example, by conducting an improper search, arrest or interrogation. The constitutional violation is termed the "poisonous tree." Any evidence obtained by exploitation of that constitutional violation is considered to be the "fruit" of the poisonous tree, and is subject to suppression at trial. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) The defendant here claimed that his interrogation amounted to a "poisonous tree" and that all evidence derived from that interrogation, including Spruille's identity and testimony, should be excluded at trial as the "fruit" of that poisonous tree. Following a hearing, the trial court denied the motion, finding that the "present state of the law was such that the motion was not well taken."

## Trial

At the defendant's trial, the State attempted to show that David Robinson agreed to pay the defendant $20,000 to kill the victim, and that the defendant, in turn, paid Glen Spruille $2,000 to shoot the victim. Robinson apparently wanted the victim killed because he was having an affair with the victim's wife. To establish this theory, the State introduced the following testimony at trial. Maria Zarinana, the victim's wife, testified that she had an affair with David Robinson during the sum-

mer of 1984, and that Robinson was obsessed with her. The victim, Arturo Zarinana, testified that, on January 9, 1985, he was shot four times as he sat in his car waiting for a co-worker. Zarinana was unable to describe his assailant, except for the fact that he was a male and wore a ski mask.

Brothers Kenneth and Robert Thatcher testified that they were employed at Robinson's construction company and that Robinson asked them to kill Zarinana in October or November of 1984. Robert Thacker testified that he declined the offer, but later told the defendant that Robinson had offered to pay $20,000 to get rid of Zarinana. The defendant allegedly responded that he knew someone who would do it. Robert Thatcher testified that he thereafter arranged a meeting between the defendant and Robinson. At this meeting, Robinson allegedly showed the defendant a piece of paper with information about Zarinana on it and tried, without success, to talk the defendant into doing the job for less money. Robinson and the defendant also agreed to refer to the killing of Zarinana as the sale of a car in any subsequent conversations. Kenneth Thatcher testified that he took a phone message for Robinson on January 9, 1985. The caller said that his name was Larry and that he had sold Dave's car.

Over the defendant's objection, Glen Spruille testified that he was employed at Robinson's construction company from June until September of 1984. Spruille testified that, in November of 1985, the defendant asked him if he knew anyone who would kill a man for $2,000. Spruille initially refused the offer, but later accepted the job for an immediate $1,000 down payment. Defendant provided Spruille with a description of Zarinana and the vehicle that he would be driving. Spruille shot Zarinana four times on January 9, 1985. Zarinana survived the attack. The defendant allegedly paid Spruille another

$1,000 the week after the shooting. Spruille testified that he entered into an agreement with the State, in which he pleaded guilty to attempted murder and conspiracy to commit murder, and agreed to testify truthfully, in return for a term of imprisonment not to exceed 45 years.

Following the State's presentation of evidence, the defendant's motion for a directed verdict was denied. The defense rested without presenting any evidence. As stated, the defendant was found guilty of all charges. Subsequently, the defendant filed a post-trial motion that included as a ground for a new trial the denial of the motion *in limine* to exclude evidence, namely the identity and testimony of Spruille, which was obtained as the "fruit" of the defendant's unconstitutionally obtained statements. The motion was denied and the defendant was sentenced to concurrent terms of 40 years' imprisonment for attempted murder and solicitation of murder and 14 years' imprisonment for conspiracy.

## Direct Appeal

On direct appeal, defendant's counsel did not raise the trial court's denial of the defendant's motion *in limine* as an issue on appeal. Instead, his counsel raised two issues: (1) that the defendant was not proven guilty beyond a reasonable doubt; and (2) that the trial court erred in admitting Kenneth Thatcher's testimony concerning the telephone message in which a caller named Larry said that he had sold Dave's car. The appellate court affirmed the defendant's convictions and sentence. *People v. Winsett* (1986), 147 Ill. App. 3d 1161 (unpublished order under Supreme Court Rule 23).

## Post-Conviction Proceedings

On February 1, 1990, the defendant filed an amended petition for post-conviction relief (Ill. Rev. Stat. 1989,

ch. 38, par. 122–1 *et seq.*), claiming that the testimonial evidence of Spruille should have been excluded at trial as the "fruit" of his impermissibly obtained statements. He also claimed that his appellate counsel was constitutionally ineffective for failing to raise the issue of the erroneous denial of the motion *in limine* on direct appeal.

An evidentiary hearing on the defendant's post-conviction petition was held before the same judge who presided at the defendant's trial. At that hearing, Michael Fusz, the chief of felony review at the Lake County State's Attorney's office in 1985, testified that, based on his review of the record, nothing in the police reports indicated that the victim or eyewitnesses could have identified Spruille as the shooter. In addition, Fusz conceded that there was no indication that the Waukegan police department was aware of Spruille's involvement in the Zarinana shooting prior to the defendant's February 20 arrest and statement identifying Spruille as the shooter. According to Fusz, however, the investigation of the offense, including interviews with Robinson's employees, would have continued absent the defendant's statements.

Detective Donald Meadie of the Waukegan police department testified that he first learned who shot Zarinana on February 20, 1985, during his interrogation of the defendant. Zarinana was unable to identify his attacker because the assailant wore a ski mask. Meadie testified that a witness saw an unfamiliar man in the area immediately following the shooting, but indicated that he would not recognize the man again unless he wore the same clothes. Meadie claimed that Robert Thatcher provided him with Spruille's name as a former Robinson employee. Meadie admitted, however, that the report of his interview with Thatcher failed to include Spruille's name. He also admitted that Thatcher was unable to provide information as to who actually shot Zarinana and did not indicate that Spruille was involved

in the offense. Meadie testified that the police were in the process of interviewing all of Robinson's past and present employees, but none identified Spruille as involved in the shooting. In sum, Meadie admitted that there were no witnesses to the shooting, and without defendant's statements, the police did not know that Spruille was linked to the shooting. However, the investigation would have continued if the defendant had not identified Spruille as the shooter.

The trial court denied the defendant's petition for post-conviction relief, finding that the "fruit of the poisonous tree" doctrine should not be applied because the violations that occurred during the defendant's questioning were not of constitutional magnitude (presumably because he found the defendant's confession voluntary). The court also found that the State had proved inevitable discovery. The appellate court reversed, holding that the defendant was denied the effective assistance of counsel on direct appeal because his counsel failed to raise the trial court's denial of the defendant's motion *in limine*. The appellate court concluded the police conduct violated the defendant's constitutional right to counsel, and that Spruille's testimony therefore should have been excluded as the "fruit" of the defendant's illegally obtained statements. The appellate court also rejected the trial court's conclusion that Spruille's testimony was admissible under the inevitable discovery exception to the exclusionary rule. The appellate court found that, although Spruille's identity would inevitably have been discovered, the evidence he provided would not have been obtained without the use of defendant's unconstitutionally obtained statements. (222 Ill. App. 3d 58.) As stated, the State appealed from the appellate court's decision.

## ANALYSIS

Four issues are raised in this appeal: (1) whether the

defendant has waived the right to challenge the admissibility of Glen Spruille's testimony at trial; (2) whether the defendant's appellate counsel was ineffective in failing to challenge the trial court's denial of the motion *in limine* on direct appeal; (3) whether the trial court improperly denied the defendant's motion to exclude Glen Spruille's testimony under the "fruit of the poisonous tree" doctrine; and (4) whether Spruille's testimony was admissible under the inevitable discovery exception to the exclusionary rule.

## I

We first consider the State's claim that the defendant has waived his right to challenge Spruille's trial testimony by failing to raise the issue on direct appeal. It is well established that the scope of post-conviction review is limited to constitutional matters which have not been, and could not have been, previously adjudicated. (*People v. Gaines* (1984), 105 Ill. 2d 79.) In this case, the trial court's denial of the motion *in limine* could have been raised on direct appeal. The defendant claims, however, that his appellate counsel was constitutionally ineffective for failing to raise this issue on direct appeal. This court has held that the doctrine of waiver should not bar the court from considering an issue where the alleged waiver stems from incompetency of counsel on appeal. (*People v. Barnard* (1984), 104 Ill. 2d 218, 229.) Accordingly, we hold that the defendant has not waived the question for purposes of review, and we address the merits of the defendant's ineffective-assistance claim.

## II

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court formulated a two-part standard for evaluating whether a defendant has been deprived of the effective assistance

of counsel. Under *Strickland*, the defendant must first establish that his counsel's performance on direct appeal was deficient or fell below an objective standard of reasonableness. Second, the defendant must demonstrate that he suffered prejudice as a result of his counsel's deficient performance. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) To demonstrate prejudice, a defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

When a reviewing court addresses an ineffective-assistance claim, it need not apply the two-part test in numerical order. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which * * * will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Applying these principles to the circumstances of this case, we first consider whether the defendant was prejudiced by his counsel's failure to raise the trial court's denial of the motion *in limine* as an issue on direct appeal. Specifically, we must determine whether the result of the defendant's direct appeal would have been different if appellate counsel had raised the disputed issue. If the issue had no merit and would not have affected the outcome on direct appeal, the defendant was not prejudiced by his counsel's failure to raise it. Thus, we must consider whether the trial court properly denied the defendant's motion to exclude Glen Spruille's testimony at trial under the fruit of the poisonous tree doctrine because it

was obtained directly as a result of his statements to the police.

To answer this question, it is necessary to review briefly the Supreme Court's jurisprudence surrounding the fifth amendment. The text of the fifth amendment to the Federal constitution guarantees that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the United States Supreme Court determined that the fifth amendment privilege against self-incrimination applies, not simply in criminal court proceedings, but in all settings where persons feel compelled to incriminate themselves. The Court determined that custodial interrogation is one of those settings. Accordingly, the Court determined that certain measures were necessary to protect the fifth amendment rights of those subjected to such interrogation. To accomplish this objective, the Court held that police interrogators must advise criminal suspects of their rights under the fifth and fourteenth amendments before questioning them about suspected wrongdoing, and set forth the now-familiar set of *Miranda* warnings. The purpose of the warnings is to ensure that the accused is aware of his substantive constitutional right not to incriminate himself and to provide him with the opportunity to exercise that right.

Among other things, suspects must be warned that they have the right to counsel, either retained or appointed, during questioning. (*Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) The *Miranda* Court explained that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." (*Miranda*, 384 U.S. at 469, 16 L. Ed. 2d at 721, 86 S. Ct. at 1625.) The primary purpose of counsel is to act as a "protective de-

vice[ ] *** to dispel the compulsion inherent in custodial surroundings." (*Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.) The presence of counsel at interrogation also reduces the likelihood that the police will coerce a defendant into confessing, and ensures that any statements actually obtained are accurately transcribed for presentation into evidence. *Miranda*, 384 U.S. at 470, 16 L. Ed. 2d at 721, 86 S. Ct. at 1626.

The *Miranda* Court also announced the procedures the police were to follow after the warnings are given. If a suspect indicates that he wishes to remain silent, the interrogation must cease. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628.) If a suspect invokes his right to counsel in response to *Miranda* warnings, all interrogation must cease until an attorney is present. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628; see also *Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486.) The Court in *Miranda* thus "fashioned *** the rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights." *Fare v. Michael C.* (1979), 442 U.S. 707, 719, 61 L. Ed. 2d 197, 209, 99 S. Ct. 2560, 2569.

In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the Court reconfirmed the principles expressed in *Miranda* and emphasized that, where an accused requests counsel, not only must the current interrogation cease, but the suspect may not be approached for further interrogation "until counsel has been made available to him." (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.) If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial. *Edwards* thus created a bright-line rule for deciding

whether an accused who has invoked his fifth amendment right to counsel has subsequently waived that right. Any waiver of the right to counsel given in a discussion initiated by the police is presumed invalid, and statements obtained pursuant to such a waiver are inadmissible in the prosecution's case in chief. The *Edwards* rule is designed to prevent the police from badgering a defendant into waiving his previously asserted *Miranda* rights. See *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (plurality opinion).

To ensure that its dictates were followed, the Supreme Court has declared that statements taken in violation of the principles established in *Miranda* and *Edwards* may not be used as substantive evidence against the accused at trial. Under this *"Miranda* exclusionary rule,"* any statement taken from a suspect without the presence of an attorney is inadmissible in the prosecution's case in chief unless the prosecution demonstrates that the defendant was given *Miranda* warnings and made a knowing and intelligent waiver of his privilege against self-incrimination. (*Miranda*, 384 U.S. at 475-77, 16 L. Ed. 2d at 724-25, 86 S. Ct. at 1628-29.) In *Edwards*, the Court held that this exclusionary rule bars the prosecution from using statements obtained after a defendant invokes his right to counsel in its case in chief, unless the State can establish (1) the *accused* initiated further discussions with the police; *and* (2) that he knowingly and intelligently waived the right he had invoked. *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.

There is no dispute that the defendant here invoked his fifth amendment right to counsel during custodial interrogation and that the police continued to question him without counsel, in violation of the principles established in *Miranda*. Consequently, the prosecutor was barred from using the defendant's statements as substantive ev-

idence at trial, in accordance with the *Miranda* exclusionary rule. The defendant points out, however, that Glen Spruille's identity was obtained directly as a result of his statement to the police. He claims that Spruille's identity was therefore the fruit of the poisonous tree and should have been excluded at trial. The defendant's argument is based upon the premise that evidence obtained as a result of statements taken in violation of *Miranda* is subject to exclusion under the fruit of the poisonous tree doctrine. As noted, the fruit of the poisonous tree doctrine applies only where the police violate a defendant's constitutional rights, for example, by conducting an unconstitutional search, arrest or interrogation. The constitutional violation is termed the "poisonous tree" and any evidence which the State obtains by exploitation of that constitutional violation is subject to suppression as the "fruit" of that poisonous tree.

The fruit of the poisonous tree doctrine is an outgrowth or extension of the *fourth amendment* exclusionary rule. (See *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 64 L. Ed. 319, 40 S. Ct. 182; *Wong Son v. United States* (1963), 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453, 83 S. Ct. 407, 415-16.) The fourth amendment exclusionary rule is a judicially created device designed to safeguard fourth amendment rights generally. It is *not* a constitutional right, nor is it calculated to redress the injury to the privacy of the victim of the search or seizure, for any "[r]eparation comes too late." (*Linkletter v. Walker* (1965), 381 U.S. 618, 637, 14 L. Ed. 2d 601, 613, 85 S. Ct. 1731, 1742.) Rather, the rule is designed to safeguard fourth amendment rights generally through its deterrent effect—" 'to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Mapp v. Ohio* (1961), 367 U.S. 643, 656, 6 L. Ed. 2d 1081, 1090, 81 S. Ct. 1684, 1692, quoting *Elkins*

*v. United States* (1960), 364 U.S. 206, 217, 4 L. Ed. 2d 1669, 1677, 80 S. Ct. 1437, 1444; *Wolf v. Colorado* (1949), 338 U.S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359.

The *Miranda* exclusionary rule is similar in some respects to the fourth amendment exclusionary rule, in that it is a judicially created device designed to deter the police from engaging in unlawful conduct. The *Miranda* exclusionary rule encourages the police to comply with the principles established in *Miranda*, by barring the use of statements taken in disregard of those principles.

The *Miranda* exclusionary rule differs in several significant respects, however, from the fourth amendment exclusionary rule. First, and foremost, the *Miranda* exclusionary rule is intended to safeguard a suspect's rights under the fifth amendment, rather than the fourth amendment. More importantly, however, the fourth amendment exclusionary rule is applied where the defendant's *constitutional rights are violated* by an unlawful search and seizure. The *Miranda* exclusionary rule, on the other hand, applies even if the defendant's constitutional rights under the fifth amendment were not violated. (See *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) The Supreme Court has explained that the fifth amendment bars only the use of statements which are compelled. Compelled or involuntary statements are excluded under the fifth amendment, not as a means of deterring unlawful police conduct, but because such statements are regarded as inherently untrustworthy and, thus, not probative. The Supreme Court has explained that the *Miranda* exclusionary rule extends further than the fifth amendment's protection against involuntary statements, in that it bars the prosecution from using a statement taken in violation of *Miranda* rules in its case in chief, even if that statement was not *compelled* within the meaning of the

fifth amendment. See *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.

The Supreme Court has consistently held that statements obtained in violation of the principles established in *Miranda* may not be used in the prosecution's *case in chief*. However, the Court has never applied the fourth amendment's fruit of the poisonous tree doctrine to bar physical or testimonial evidence derived from a statement taken in violation of a defendant's fifth amendment *Miranda* rights. In fact, the Court has on two separate occasions specifically refused to apply the fruit of the poisonous tree doctrine to suppress evidence obtained as the "fruit" of a statement taken in violation of *Miranda*. (*Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) The Court in these cases drew a distinction between police conduct which infringes directly upon an accused's constitutional rights and conduct which violates only the prophylactic rules developed to protect those rights. The "fruit" of a statement obtained in violation of a constitutional right must be suppressed (*Wong Son v. United States* (1963), 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453, 83 S. Ct. 407, 415-16), but the "fruit" of a statement obtained in violation of a prophylactic rule is not automatically subject to exclusion (*Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285). The Court has held that the *Miranda* warnings are not constitutional rights, but are simply prophylactic measures designed to safeguard a suspect's fifth amendment rights. (*Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.) Consequently, where the police violate the prophylactic rules developed in *Miranda*, but do not actually violate the

defendant's fifth amendment privilege against self-incrimination, the fruit of the poisonous tree doctrine will not be applied to exclude physical or testimonial evidence derived from the defendant's statements.

For example, in *Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357, the Court considered whether the fruit of the poisonous tree doctrine should be applied to bar the testimony of a witness whose identity the defendant revealed during interrogation which was not preceded by complete *Miranda* warnings. The defendant in *Tucker* was arrested and subjected to custodial interrogation before the Supreme Court handed down its decision in *Miranda*. Because his trial took place after *Miranda*, however, that decision was applicable. At the time of his arrest, and in accordance with then applicable legal principles, the police advised Tucker that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney. The police failed to advise Tucker, however, that he had the right to appointed counsel, as *Miranda* subsequently required. Tucker responded that he understood his rights and that he did *not* want an attorney. *Tucker*, 417 U.S. at 436, 41 L. Ed. 2d at 188, 94 S. Ct. at 2359-60.

The defendant was then interrogated and provided the police with exculpatory statements, including the name of an alibi witness. (*Tucker*, 417 U.S. at 436, 41 L. Ed. 2d at 188, 94 S. Ct. at 2360.) Instead of providing the defendant with an alibi, however, the witness provided the police with information which inculpated the defendant. (*Tucker*, 417 U.S. at 436-37, 41 L. Ed. 2d at 188, 94 S. Ct. at 2360.) Although the defendant's statements were excluded in accordance with *Miranda*, the witness was allowed to testify and the defendant was convicted. *Tucker*, 417 U.S. at 437, 41 L. Ed. 2d at 188-89, 94 S. Ct. at 2360.

The Supreme Court held that the testimony of a witness whose identity was discovered during questioning that did not strictly comply with the principles established in *Miranda* need not be excluded as the fruit of the poisonous tree. In reaching this conclusion, the *Tucker* Court drew a distinction between a violation of a defendant's constitutional rights and a mere violation of *Miranda*'s prophylactic safeguards. The Court determined that the police conduct at issue in *Tucker* did not actually violate the defendant's constitutional rights under the fifth amendment, because the defendant's statements to the police were voluntary. The Court then declared that the *Miranda* warnings are "not themselves rights protected by the Constitution," but are instead only prophylactic standards designed to insure that the privilege against compulsory self-incrimination is protected. (*Tucker*, 417 U.S. at 444, 41 L. Ed. 2d at 193, 94 S. Ct. at 2364.) Because the police violated only the procedural rules established in *Miranda*, but did not actually infringe upon the defendant's constitutional privilege against compelled self-incrimination, the Court determined that the fruit of the poisonous tree doctrine was inapplicable.

After concluding that the police conduct did not actually violate the defendant's rights under the fifth amendment because his statement was voluntary, the *Tucker* Court went on to consider whether the deterrent purpose of the *Miranda* exclusionary rule would be advanced by excluding the fruits of the defendant's statements. The Court asserted that the deterrent purpose of the exclusionary rule is effectuated only where the police have engaged in willful or, at the very least, negligent conduct. (*Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365.) Because the questioning in *Tucker* occurred before *Miranda* was announced, and because the police had complied with constitutional principles in ef-

fect at the time of the interrogation, the exclusion of the witness' testimony would not significantly deter future *Miranda* violations. As the Court noted, the "deterrence rationale loses much of its force" when there is no willful or negligent conduct to deter. (*Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365.) Thus, the Court concluded that, while the defendant's statements must be suppressed, the "fruits" of those statements need not be excluded.

The precise scope of the *Tucker* opinion was unclear. The first part of the *Tucker* opinion appeared to foreclose the possibility that the "fruits" doctrine would ever apply to *Miranda* violations, by holding that a *Miranda* violation is not a constitutional violation and, thus, does not constitute a "poisonous tree." Because a *Miranda* violation does not constitute a "poisonous tree," the testimony of the witness could never be excluded as the "fruit" of the poisonous tree. In the second part of the *Tucker* opinion, however, the Court left open the possibility that it would apply the fruit of the poisonous tree doctrine in circumstances where the police willfully failed to comply with the principles established in *Miranda*. Later, however, the Court declined to limit *Tucker* in this manner. *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285.

In *Elstad*, the Court refused to exclude evidence obtained as the "fruit" of a willful *Miranda* violation under the fruit of the poisonous tree doctrine. In *Elstad*, police officers questioned the defendant in his home without giving him *Miranda* warnings. The police expressed their belief that the defendant was involved in a burglary and the defendant admitted that he was involved. (*Elstad*, 470 U.S. at 301, 84 L. Ed. 2d at 227, 105 S. Ct. at 1288-89.) The defendant was then taken to police headquarters, where he was given *Miranda* warnings and questioned again. The defendant waived his

rights and gave a written statement, explaining his exact involvement in the burglary. The Court suppressed the defendant's first statement because it was not preceded by *Miranda* warnings. The defendant argued that his second statement should likewise be excluded as the fruit of the poisonous tree, but the *Elstad* Court held that the fruits doctrine did not apply.

The Court specifically rejected the defendant's argument that the failure to administer *Miranda* warnings breeds the same consequences as the violation of the constitutional right against self-incrimination, so that evidence uncovered following an unwarned statement must be suppressed as the fruit of the poisonous tree. The Court reiterated that the *Miranda* warnings are not themselves rights protected under the Constitution, but are simply prophylactic standards designed to safeguard the fifth amendment privilege against compelled self-incrimination. *Elstad*, 470 U.S. at 305, 84 L. Ed. 2d at 229-30, 105 S. Ct. at 1291, quoting *New York v. Quarles* (1984), 427 U.S. 649, 654, 81 L. Ed. 2d 550, 555-56, 104 S. Ct. 2626, 2630.

The Court emphasized that the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment itself [and] [m]ay be triggered even in the absence of a Fifth Amendment violation." (*Elstad*, 470 U.S. at 306, 84 L. Ed. 2d at 230, 105 S. Ct. 1291-92.) The fifth amendment prohibits only the use of *compelled* or involuntary statements. A *Miranda* violation does not *constitute* compulsion, but simply affords a bright-line, legal presumption of compulsion whenever a suspect's statements are not preceded by *Miranda* warnings. (*Elstad*, 470 U.S. at 307, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292.) This presumption of compulsion renders unwarned statements inadmissible in the prosecution's case in chief, even though those statements might be considered "voluntary" within the meaning of the fifth amendment.

The Court declared that the *Miranda* presumption of compulsion, though irrebutable for purposes of the prosecution's case in chief, does not require the exclusion of the unwarned statements and its fruits for all purposes. (*Elstad,* 470 U.S. at 307, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292.) The Court declared that "[w]here an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, 'the primary criterion of admissibility [remains] the "old" due process voluntariness test.' " *Elstad,* 470 U.S. at 307-08, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292, quoting Schulhofer, *Confessions and the Court,* 79 Mich. L. Rev. 865, 877 (1981).

The Court noted, by way of example, that the *Miranda* presumption of coercion does not bar the government from using *voluntary* statements taken in violation of *Miranda* for impeachment purposes on cross-examination. (*Elstad,* 470 U.S. at 307, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292, citing *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.) The *Elstad* Court also pointed out that, in *Tucker,* it had refused to extend the fruit of the poisonous tree doctrine to suppress the testimony of a witness whose identity the defendant revealed in a statement which was not preceded by complete *Miranda* warnings. The breach of *Miranda* procedures in *Tucker* did not involve actual compulsion, and consequently, there was no violation of the defendant's constitutional privilege against self-incrimination. Because there was no constitutional violation, the doctrine requiring the suppression of the fruits of a constitutional violation was inapplicable. (*Elstad,* 470 U.S. at 308, 84 L. Ed. 2d at 231-32, 105 S. Ct. at 1292.) The *Elstad* Court concluded that the reasoning of *Tucker* "applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness nor an article of evidence but the accused's own volun-

tary testimony." *Elstad*, 470 U.S. at 308, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.

*Elstad* and *Tucker* together make clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the fruits of the unwarned statement. Where the unwarned statement is voluntary, and not a product of "inherently coercive police tactics or methods offensive to due process" (*Elstad*, 470 U.S. at 317, 84 L. Ed. 2d at 237, 105 S. Ct. at 1297), there is no fifth amendment violation, and the "fruits" of the statement may be admitted in the State's case in chief. *Cf. United States v. Jones* (6th Cir. 1988), 846 F.2d 358 (where defendant's statements violate *Miranda* and are involuntary, evidence obtained as a result of those statements is barred under the fruit of the poisonous tree doctrine).

This case differs in a significant respect from *Tucker* and *Elstad*. In those cases, the police simply failed to comply with the prophylactic rule requiring the police to warn a suspect of his rights under the fifth amendment. The defendants in *Tucker* and *Elstad* never invoked their right to counsel prior to questioning. Here, on the other hand, the defendant specifically invoked his right to counsel prior to interrogation. Nevertheless, the police continued to interrogate him without affording him the opportunity to have counsel present during questioning. We must consider whether this factual difference compels a different result from that reached in *Tucker* and *Elstad*.

Initially, we note that the trial court determined that the defendant's statements were voluntary, and not the product of police trickery or coercion. The defendant does not challenge that determination in this proceeding. Rather, the defendant claims that the "fruits" of a statement obtained after a request for counsel must be ex-

cluded at trial, even if the statement itself is voluntary within the meaning of the fifth amendment.

As stated, the Supreme Court has established that the "fruit" of a statement obtained in violation of a constitutional right must be suppressed (*Wong Sun v. United States* (1963), 371 U.S. 471, 484-85, 9 L. Ed. 2d 441, 453, 83 S. Ct. 407, 415-16), but the "fruit" of a statement obtained in violation of a prophylactic rule need not be excluded (*Elstad,* 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285). Consequently, we must consider whether the failure of the police to cease all interrogation after a suspect invokes his right to counsel in response to *Miranda* warnings is a constitutional violation, or simply a violation of a prophylactic rule designed to safeguard a defendant's fifth amendment rights.

Although the United States Supreme Court has not directly addressed this question, its decisions on related matters persuade us that the right to have counsel present during questioning and the rule that all interrogation must cease once a suspect requests counsel are not themselves constitutional rights, but are simply "prophylactic measures" designed to safeguard the fifth amendment privilege against self-incrimination. (See *Fare v. Michael C.* (1979), 442 U.S. 707, 719, 61 L. Ed. 2d 197, 208, 99 S. Ct. 2560, 2568; *Smith v. Illinois* (1984), 469 U.S. 91, 95, 99 n.8, 83 L. Ed. 2d 488, 494, 496 n.8, 105 S. Ct. 490, 493, 494 n.8.) In this regard, we note that the *Miranda* Court determined that the purpose of counsel during interrogation is to act as a "protective device[ ] *** to dispel the compulsion inherent in custodial surroundings." (*Miranda,* 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.) The Court later stated that a defendant who invokes his right to counsel thereby expresses his " 'desire to deal with the police only through counsel.' " (*McNeil v. Wisconsin* (1991), 501 U.S. 171, 178, 115 L. Ed. 2d 158, 168, 111 S. Ct.

2204, 2209, quoting *Edwards,* 451 U.S. at 484, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.) The fact that the police continue to question a defendant who invokes his right to counsel does not necessarily mean that the defendant's statements are, in fact, compelled or involuntary, within the meaning of the fifth amendment. Rather, *Miranda* and its progeny create an irrebutable presumption that the defendant's statement is compelled (and that any waiver of the privilege against self-incrimination is likewise compelled), whenever the police question an unrepresented defendant, after that defendant invokes his right to counsel. (*Miranda,* 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28; see *Fare v. Michael C.* (1979), 442 U.S. 707, 718, 61 L. Ed. 2d 197, 208, 99 S. Ct. 2560, 2568.) This presumption of compulsion had the benefit of informing the police with specificity what they may do in conducting custodial interrogation. This gain in specificity was thought to outweigh the burdens the *Miranda* exclusionary rule imposes in terms of requiring the suppression of trustworthy and highly probative evidence, even though the defendant's statements might be voluntary under the fifth amendment. (*Fare v. Michael C.* (1979), 442 U.S. 707, 718, 61 L. Ed. 2d 197, 208, 99 S. Ct. 2560, 2568.) Consequently, any statement obtained after a defendant has invoked his right to counsel may not be admitted as substantive evidence in the prosecution's *case in chief,* unless the defendant initiated the subsequent contact and made a knowing and intelligent waiver of his *Miranda* rights. *Edwards,* 451 U.S. at 484, 68 L. Ed. 2d at 386, 86 S. Ct. at 1884.

Where the State seeks to use a statement obtained in violation of the *Miranda* right to counsel for other purposes, however, we conclude that the Supreme Court will follow the reasoning of *Tucker* and *Elstad,* and hold that the sole criterion for admissibility is whether the

defendant's statement is "voluntary." (*Elstad,* 470 U.S. at 307-08, 84 L. Ed. 2d at 231, 105 S. Ct. at 1292-93.) As support for this conclusion, we note that the Supreme Court has "mandated the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements." (Emphasis in original.) *Michigan v. Harvey* (1990), 494 U.S. 344, 351, 108 L. Ed. 2d 293, 303, 110 S. Ct. 1176, 1181, citing *New Jersey v. Portash* (1979), 440 U.S. 450, 459, 59 L. Ed. 2d 501, 510, 99 S. Ct. 1292, 1297 (compelled incriminating statements inadmissible for impeachment purposes); *Mincey v. Arizona* (1978), 437 U.S. 385, 398, 57 L. Ed. 2d 290, 303, 98 S. Ct. 2408, 2416.

We also note that the Court has already determined that statements taken from a defendant after he invokes his *Miranda* right to counsel are admissible to impeach a defendant's conflicting testimony at trial, if those statements are voluntary. (*Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215.) In reaching this result, the Court in *Hass* simply adopted the reasoning employed in its previous decision in *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643, which held that voluntary statements taken from a defendant, who was not given complete *Miranda* warnings, were admissible to impeach a defendant's conflicting testimony at trial. The Court in *Harris* weighed the competing social values underlying the exclusionary rule and found that the benefits of permitting the use of voluntary statements to impeach outweighed the costs (in terms of decreased deterrence) of permitting such use. *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.

In *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215, the Court simply extended the reasoning of *Harris* to a case where the accused invoked his right to counsel in response to *Miranda* warnings,

and the police continued to question him without affording him the opportunity to consult with counsel. The Court concluded that the defendant's statements to the police were voluntary and, thus, could be used to impeach his conflicting testimony at trial.

In so holding, the Court rejected the State court's conclusion that application of the *Miranda* exclusionary rule was necessary to deter the police from continuing to interrogate a suspect who has invoked his right to counsel in response to *Miranda* warnings. (*Hass*, 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215.) The *Hass* Court also ignored the dissenting justices' criticism that the Court had completely eliminated any incentive the police had for following *Miranda*'s requirement that interrogation cease once an accused has requested counsel. (*Hass*, 420 U.S. at 725, 43 L. Ed. 2d at 579, 95 S. Ct. at 1222 (Brennan, J., dissenting, joined by Marshall, J.).) The majority conceded that the police may have little to lose and perhaps something to gain by way of impeachment material by continuing to interrogate an accused who has asked for an attorney. The *Hass* majority concluded, however, that it would adhere to the conclusion in *Harris*, that sufficient deterrence is achieved when the evidence in question is made unavailable to the prosecution in its case in chief. (*Hass*, 420 U.S. at 723, 43 L. Ed. 2d at 578, 95 S. Ct. at 1221.) The Court concluded that "[i]f, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises *measured by the traditional standards for evaluating voluntariness and trustworthiness.*" (Emphasis added.) (*Hass*, 420 U.S. at 723, 43 L. Ed. 2d at 578, 95 S. Ct. at 1221.) The decision in *Hass* was reaffirmed by the Supreme Court five years later, in *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912.

In light of *Tucker, Elstad* and *Hass*, we conclude that the right to counsel established in *Miranda* is not a constitutional right but, rather, is a prophylactic device designed to safeguard the privilege against compelled self-incrimination. Where the State continues to question a defendant who has invoked his right to counsel, *Miranda* established a presumption of compulsion which renders any statement obtained from a defendant inadmissible in the State's case in chief. Where a statement obtained during police-initiated questioning after a request for counsel is otherwise voluntary, however, *Tucker* and *Hass*—when taken together—authorize use of the defendant's statements to locate third-party witnesses such as Spruille and the admission of such witnesses' testimony at trial. Accordingly, the trial court properly denied the defendant's motion *in limine* to exclude Spruille's testimony under the fruit of the poisonous tree doctrine. (See *United States v. Cherry* (5th Cir. 1986), 794 F.2d 201; *Wilson v. Zant* (1982), 249 Ga. 373, 290 S.E.2d 442; *cf. Commonwealth v. Lahti* (1986), 398 Mass. 829, 501 N.E.2d 511.) Because we conclude that the defendant's motion was properly denied, we need not address the State's alternative claim that Spruille's testimony was properly admitted at trial under the "inevitable discovery" exception to the exclusionary rule.

As previously noted, both the incompetence and the prejudice prongs of the *Strickland* standard must be satisfied before counsel will be deemed constitutionally ineffective. Given the uncertain state of the law surrounding the question of whether the fruit of the poisonous tree doctrine should apply to *Miranda* violations, we believe that defendant's appellate counsel should have challenged the trial court's ruling on the motion *in limine* on direct appeal. Applying the principles announced in the relevant Supreme Court decisions, however, we conclude that such a challenge would have

proved unsuccessful. Consequently, the defendant cannot establish that he was prejudiced by his appellate counsel's failure to raise the trial court's denial of the motion *in limine* as an issue on direct appeal. Accordingly, we must conclude that he was not deprived of the effective assistance of counsel on direct appeal.

Because the defendant was not deprived of the effective assistance of counsel on direct appeal, the circuit court properly denied his petition for post-conviction relief. The appellate court's judgment is reversed, the judgment of the circuit court is affirmed, and the defendant's convictions and sentences are reinstated.

*Appellate court reversed;*
*circuit court affirmed.*