NOTICE
Decision filed 07/08/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170324-U

NO. 5-17-0324

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 12-CF-18 |
| | ) | |
| TYLON HAWTHORNE, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Welch and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial counsel did not render ineffective assistance of counsel for failing to file a motion to suppress the defendant's statements to police.

¶ 2    Tylon Hawthorne, the defendant, was convicted in the circuit court of Jefferson County of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2), (b) (West 2012))[1] and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2012)). He was sentenced to concurrent 12-year and 10-year terms, respectively, in the Department of Corrections. The

_____

[1]The information charged the defendant with a violation of 720 ILCS 5/24-1.2(a)(1) (West 2012), which is the subsection for the offense of discharging a firearm at or into a building the person knows or reasonably should know to be occupied. The jury was instructed on the elements of subsection (a)(2), aggravated discharge of a firearm when the defendant knowingly discharges a firearm in the direction of another person, which was consistent with the description of the offense contained in the information and the evidence presented at trial.

1

defendant appeals his convictions, claiming his trial counsel was ineffective for failing to file a motion to suppress his statements to police. We affirm.

¶ 3                                  BACKGROUND

¶ 4     On January 24, 2012, the State charged the defendant by information with aggravated discharge of a firearm for discharging a firearm in the direction of another person within 1000 feet of a school in violation of 720 ILCS 5/24-1.2(a)(2), (b) (West 2012), and unlawful possession of a weapon by a felon in violation of 720 ILCS 5/24-1.1(a) (West 2012). The following evidence was adduced at trial.

¶ 5     On January 19, 2012, the defendant lived at 301 S. 19th Street in Mt. Vernon, a white two-story building located at the corner of 19th Street and Casey Street. The defendant lived with his mother and three siblings, including his brother Jaquez Gardner (Gardner). The home was catty-corner to Casey Middle School.

¶ 6     On that date, at 9:30 a.m., Steven Rainey was at his home near the intersection of 18th and Casey Streets, watching television, when he heard gunshots. Rainey looked out of his window and saw a black male walking south on 19th Street, away from Casey Street. The man was holding a pistol and shooting in a northwesterly direction. Rainey saw a tall, black male wearing a red letterman jacket with white sleeves emerge from the building located at 19th and Casey. Rainey testified the man in the red jacket returned fire, shooting to the south.

¶ 7     Rainey immediately called 911 and reported the incident. A recording of Rainey's conversation with the 911 dispatcher was played for the jury at trial. During the call, Rainey reported that he saw two men shooting at each other with pistols. Rainey stated that one of the men was wearing a red letterman jacket with white sleeves and had run into the north entrance of 301

2

S. 19th Street. While waiting for police to respond to the scene, Rainey reported seeing the man with the red jacket exit the residence with a woman and walk around the building.

¶ 8    John Stebbins, a maintenance worker at Casey Middle School, testified that around 9:30 a.m. on January 19, 2012, he and Kerry Robertson, another maintenance worker, were in the parking lot of the school preparing to unload a trailer. Stebbins heard a pop from the southwest and looked up to see a black male wearing a red and white jacket standing at the back door of the house at the corner of 19th and Casey Streets. Stebbins saw the man in the red and white jacket step off the porch of the house, extend his arm, and fire a gun at a second man. Stebbins testified he was approximately 150 feet away from the scene. School was in session at the time, so the school was immediately placed on lockdown.

¶ 9    Kerry Robertson testified he was working in the parking lot of the school when he heard gunfire from the southwest. Robertson saw a black male wearing a red letterman jacket with white sleeves, exit from the back door of the white house on the corner of 19th and Casey Streets. The man in the red jacket ducked slightly, extended his arm, and fired two shots from a pistol toward the south.

¶ 10    Detectives Kevin Jackson and Scott Smith were in the parking lot of the Mt. Vernon Police Department when they heard gunshots to the west. The detectives had already begun driving to the west when they received a dispatch advising them that two subjects were shooting at each other near 19th and Casey Streets. Jackson was familiar with the defendant and Gardner, and knew the men lived at the residence at 301 S. 19th Street. As the detectives neared 18th and Casey, Jackson saw the defendant walk into the north entrance of the residence at 301 S. 19th Street. Jackson testified that the defendant was wearing a red jacket. As the detectives neared the scene, Jackson saw Gardner walking through an alleyway, away from the residence, wearing a black or dark gray

3

jacket. Gardner fled, throwing a handgun in the front yard of a nearby residence, which was later recovered by police. Jackson pursued Gardner on foot and was able to effectuate an arrest.

¶ 11    Detective Smith testified that as he and Jackson approached the scene in their vehicle, Smith saw two people standing outside of the north entrance of 301 S. 19th Street, a black male wearing a red letterman jacket and a woman. As the detectives got closer to the scene, the two individuals entered the residence. Smith also observed Gardner walking southbound away from the residence. Smith testified that after Jackson apprehended Gardner, Smith and Jackson joined several other officers at the scene. At the residence, Smith saw the defendant and recognized him as the man he had seen earlier wearing the red jacket. A subsequent search of the defendant's bedroom at 301 S. 19th Street recovered a red letterman jacket with white sleeves tucked into the defendant's closet.

¶ 12    The defendant was placed under arrested and transported to the Mt. Vernon Police Department, where Detective Travis Trotter conducted a recorded interview of the defendant. At the beginning of the interview, Trotter advised the defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant acknowledged that he understood his rights and signed a *Miranda* waiver form to waive those rights. The recording of the interview was played for the jury at trial, without objection.

¶ 13    During the interview, Trotter explained that he had already spoken with Gardner and wanted to get the defendant's side of the story.

"DETECTIVE TROTTER: All right. So talk to me, man. Tell me what happened here.

THE DEFENDANT: (Nodding head side to side.) It's a whole bunch of BS.

DETECTIVE TROTTER: Well, what was it over?

4

THE DEFENDANT: About on my way going to school. That's what it was over.

DETECTIVE TROTTER: Going to school?

THE DEFENDANT: Me going to school.

DETECTIVE TROTTER: He got pissed off about it?

THE DEFENDANT: Yep.

DETECTIVE TROTTER: And then what?

THE DEFENDANT: Everything escalated from there.

DETECTIVE TROTTER: He had a gun?

THE DEFENDANT: I don't want to talk about it.

DETECTIVE TROTTER: Well, you see, the problem I've got is I've got guns being fired both directions. And if I've got two people that don't want to talk about it, looks likes I got two people trying kill each other. I've got one guy who was willing to talk. You don't want to talk, that's your choice. That's your God given right. But, if you don't want to tell us your side of it, I can only go with one and that ain't good for you. You're an educated kid. Go to school. Got a career. You got a kid?

THE DEFENDANT: Yes, sir."

¶ 14 After several more minutes of conversation, the defendant said that he and Gardner got into an argument that morning over their mother's truck. The defendant admitted to shooting at Gardner twice after Gardner fired four shots at the house. The defendant indicated that he had tossed the gun after the incident, and that he could take the officers to it.

¶ 15 The interview lasted approximately 25 minutes, after which several officers went with the defendant back to the area near 301 S. 19th Street to look for the gun used by the defendant during the incident. Trotter testified that the defendant told Trotter, after the recorded interview was concluded, that the defendant had used a black revolver and that he tossed the gun as he ran after

5

the incident. Trotter testified the police did not recover the defendant's weapon, but that they did find a broken toy pistol during their search.

¶ 16    Officer James Kemp testified that he transported the defendant back to the police department after the search for the gun. Kemp testified that as they were waiting for the detectives to return, the defendant spontaneously stated, "That's my goddamn brother. I hate him."

¶ 17    At trial, the defendant testified that he had to appear in traffic court on the morning of January 19, 2012. When he returned home, he prepared to borrow his mother's truck to drive to his welding class. Gardner also wanted to use their mother's truck, and the two men got into a verbal argument. The defendant testified that Gardner brandished a gun during the argument and their mother ordered Gardner to leave. Shortly after Gardner left, someone fired four shots at the house. The defendant testified that his grandmother, who was visiting, became faint at the gunshots and he attempted to help her. The defendant testified he then went out the back door, unarmed, to check the perimeter of the house.

¶ 18    The defendant further testified that the gunshots "triggered him," reminding him of an event six weeks earlier when someone shot 10 rounds into their house. The defendant asserted that the assailants were never found, and that during his own investigation, he discovered that the assailants evaded capture by listening to police scanners. The defendant testified he understood his *Miranda* rights, and that he confessed to possessing a gun and to shooting at Gardner in the hopes that this information would be broadcast over the police radios and would discourage any future would-be assailants from shooting at his house. The defendant testified he intentionally led the police to the toy gun near the scene to prove to the police that he did not have a gun that day. The defendant admitted he had been wearing the red jacket that morning, which was later recovered

6

from his room. At trial, the defendant denied shooting at Gardner, or to even knowing who shot at the house that morning.

¶ 19    The jury convicted the defendant on both charges. On July 6, 2012, the trial court sentenced the defendant to 12 years on the aggravated discharged of a firearm conviction and to 10 years on the unlawful possession of a weapon by a felon conviction, with the sentences to run concurrently with each other.

¶ 20    On July 27, 2012, the defendant's trial counsel filed a motion to reconsider the sentence and a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion for judgment notwithstanding the verdict included an allegation that trial counsel was ineffective for failing to file a motion to suppress the defendant's statements to police as involuntary. On August 14, 2012, the trial court appointed posttrial counsel to assist the defendant. On August 14, 2013, posttrial counsel filed a second amended motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. In the amended motion, the defendant alleged that his trial counsel was ineffective for failing to file a motion to suppress the defendant's statement despite repeated requests from the defendant to do so.

¶ 21    On August 20, 2013, the trial court held a hearing on the defendant's motions. At the hearing, the defendant testified that he requested his trial counsel to file a motion to suppress his statements to the police on three occasions. The defendant testified that trial counsel indicated he could not file a motion to suppress but did not provide any explanation as to why he could not do it.

¶ 22    Trial counsel testified at the hearing that he did not recall the defendant specifically requesting counsel to file a motion to suppress his statements. Counsel testified, however, that filing a motion to suppress would have delayed the start of the defendant's trial beyond 120 days

7

from the date of his arrest, and that he "seem[ed] to recall that [the defendant] did not want to extend his 120 days." Counsel also testified that the defendant was Mirandized prior to making his statement and that, in counsel's experience, he did not need to file a motion to suppress.

¶ 23    On February 18, 2014, the trial court entered a docket entry denying the defendant's posttrial motions. The trial court found, based on the evidence presented at the trial and at the posttrial hearing, that trial counsel's performance did not fall below a reasonable standard and did not prejudice the defendant. On March 31, 2014, the defendant filed a *pro se* late notice of appeal, which this court denied.

¶ 24    On June 4, 2015, the defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)), asserting his trial counsel was ineffective for failing to file a motion to suppress and his posttrial counsel was ineffective for failing to file a timely appeal. On January 18, 2017, the court appointed postconviction counsel to represent the defendant. On July 7, 2017, appointed counsel filed an amended postconviction petition, arguing the defendant was denied the effective assistance of counsel because his posttrial counsel failed to perfect a direct appeal.

¶ 25    On August 7, 2017, the State filed a "motion to dismiss" the defendant's amended postconviction petition in which it confessed the issue of ineffective assistance of posttrial counsel for failing to perfect an appeal. On August 16, 2017, the circuit court issued an order granting the defendant's postconviction petition and awarding the defendant a direct appeal of his convictions and sentences. This appeal follows.

¶ 26                                    ANALYSIS

¶ 27                          Ineffective Assistance of Counsel

¶ 28    On appeal, the defendant argues he invoked his right to remain silent during the police interview, and that trial counsel's failure to file a motion to suppress his confession obtained in violation of this right fell below an objective standard of reasonableness. The defendant argues that a motion to suppress his statements to police would have been meritorious and that, absent the admission of his confession, the result of the trial would have been different.

¶ 29    Claims of ineffective assistance of counsel are evaluated under the two-prong test established by *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on a claim of ineffective assistance of counsel, the defendant must show that his counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Henderson*, 2013 IL 114040, ¶ 11. The failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 30    When a claim of deficient representation is based upon counsel's failure to file a motion to suppress, in order to establish prejudice, the defendant must demonstrate that the motion was meritorious and that a reasonable probability exists that the outcome of the trial would have been different had the evidence been suppressed. *Henderson*, 2013 IL 114040, ¶ 15. A reasonable probability that the outcome of the trial would have been different is a probability sufficient to undermine confidence in the result of the trial. *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 31    The decision whether to file a motion to suppress is generally a matter of trial strategy, and counsel's decision is accorded great deference. *People v. Gayden*, 2020 IL 123505, ¶ 28.

Furthermore, there is a strong presumption that counsel's action or inaction was the product of sound trial strategy. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). Counsel's strategic choices are virtually unchallengeable. *People v. Manning*, 241 Ill. 2d 319, 333 (2011). Matters of trial strategy generally do not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing of the State's case. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005).

¶ 32    Here, trial counsel testified at the posttrial hearing that the defendant did not want to extend his trial beyond 120 days from the date he was arrested. Section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2012)), the speedy trial statute, provides that an accused in custody must be brought to trial within 120 days from the date he is taken into custody, unless the delay is occasioned by the defendant. The statute enforces the constitutional right to a speedy trial guaranteed by the federal and Illinois Constitutions (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). *People v. Mosley*, 2016 IL App (5th) 130223, ¶ 9. "Any type of motion filed by the defendant which eliminates the possibility that the case could immediately be set for trial *** constitutes an affirmative act of delay attributable to the defendant." *People v. Plair*, 292 Ill. App. 3d 396, 398 (1997). The delay resulting from a defendant's filing of a motion to suppress, including the time associated with processing and hearing the motion, is attributable to the defendant. *Plair*, 292 Ill. App. 3d at 399-400.

¶ 33    Defendant was arrested on January 19, 2012, and remained in custody until the trial began on May 15, 2012, a period of 117 days. Trial counsel testified that the defendant did not want to extend his trial date beyond the 120-day period, and that filing a motion to suppress would have extended that date. The evidence presented at the posttrial hearing indicates that counsel made a

10

strategic decision not to file a motion to suppress the defendant's statements based upon the defendant's desire to enforce his right to a speedy trial.

¶ 34 Notably, the Illinois Supreme Court has recognized that a defendant's due process rights are not denied when he is forced to choose between the two constitutional rights, including the right to a speedy trial and the right to the effective assistance of counsel. See *People v. Lewis*, 60 Ill. 2d 152, 156-57 (1975) ("Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (Internal quotation marks omitted.)); *People v. Bowman*, 138 Ill. 2d 131, 147-48 (1990); *People v. Williams*, 59 Ill. 2d 402, 405-06 (1974); and *People v. Hairston*, 46 Ill. 2d 348, 353-54 (1970) (defendant may have to choose between the constitutional rights to a speedy trial and to be represented by his retained counsel of choice).

¶ 35 In *People v. Johnson*, 45 Ill. 2d 38 (1970), the court addressed a defendant's contention that he was forced into going to trial without adequate time to prepare a defense. The court stated:

"To argue that he was forced to choose as he did is to argue technicalities. The right to a speedy trial and the right to avoid a precipitous trial are separate but related rights. Both are designed to assure an accused a fair trial, to prevent undue delay in one instance and undue haste in the other. He can demand action or avoid action as the exigencies of his situation may dictate. But fairness and justice are not a one-way street. *** The fact that on occasion the accused might have to jeopardize the legislative benefits of the [speedy-trial] rule by asserting his right to a continuance does not entail a denial of his right to a speedy trial. *** The election was defendant's to determine on the basis of what would better ensure him a fair trial, and, having chosen to proceed, his present argument is nothing more than technical obfuscation." *Johnson*, 45 Ill. 2d at 43-44.

¶ 36 Here, the record indicates that trial counsel's decision not to file a motion to suppress was an exercise of trial strategy, influenced in large part by the defendant's desire for a speedy trial, and is not subject to a claim of ineffective assistance of counsel.

¶ 37 Also, assuming *arguendo* that trial counsel's decision not to file a motion to suppress the defendant's statements to police fell below the objective standard of reasonableness and that the

11

motion was meritorious, the defendant has failed to demonstrate that he was prejudiced by the omission. The evidence at trial was that on the morning of January 19, 2012, multiple people heard gunshots coming from the area near 19th and Casey Streets. Shortly thereafter, three eyewitnesses, from two different vantage points, saw a black male wearing a red letterman jacket with white sleeves emerge from the defendant's home, and return fire by discharging a handgun in a southerly direction. Moments after the shooting, two Mt. Vernon detectives saw the defendant wearing a red jacket standing outside the residence. Officers recovered a red letterman jacket with white sleeves from a closet in the defendant's bedroom. At trial, the defendant admitted to wearing a red jacket on the day of the incident and to getting into a verbal argument with Gardner, who was armed with a handgun, immediately before the shooting. Gardner was arrested by officers just south of the residence after he fled from the police, tossing a handgun along the way. Although the State's three eyewitnesses to the shooting were only able to identify the second shooter by his location and distinctive clothing, all of the evidence indicates that the defendant was in this exact location and wearing this distinctive article of clothing at the time of the shooting. The defendant does not contest this evidence. Instead, he asserts that he did not fire a weapon but was only outside checking the perimeter after an unknown assailant fired at the home.

¶ 38    While credibility is a question for the trier of fact, the evidence overwhelmingly supports a finding that the defendant was not outside the residence just checking the perimeter but was, in fact, actively engaged in a shootout. In light of the evidence, we are not persuaded that it is reasonably probable that a jury would have acquitted the defendant, even in the absence of his confession. Therefore, the defendant has failed to establish the prejudice prong of the *Strickland* test, and we reject his claim that defense counsel was ineffective for failing to file a motion to suppress his statements to police.

¶ 39                                     Plain Error

¶ 40    Alternatively, the defendant argues the admission of his confession is reviewable as plain error. The plain-error doctrine allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). Under the first prong, the defendant must demonstrate that the error was prejudicial, which is to say that there was a plain error and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 564-65. Under the second prong, the defendant must demonstrate that there was a plain error and "the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565.

¶ 41    In this case, the defendant has failed to demonstrate that the admission of his confession amounted to a plain error. As already noted, the evidence of the defendant's guilt was overwhelming, thus it cannot be said that the evidence was so closely balanced that the alleged error alone threatened to tip the scales of justice against him.

¶ 42    Nor do we find that the defendant has established that the alleged error was so serious that it affected the fairness of his trial. The fifth amendment to the federal constitution (U.S. Const., amend. V) bars the use of compelled or involuntary statements because such statements are inherently untrustworthy. *People v. Winsett*, 153 Ill. 2d 335, 352 (1992). *Miranda* warnings are not constitutional rights, but are prophylactic measures designed to safeguard a suspect's fifth amendment rights. *Winsett*, 153 Ill. 2d at 353. In this case, the defendant has failed to demonstrate that his statements to the police were involuntary. At trial, the defendant testified that he gave the police a false statement as part of an elaborate scheme to scare off would-be assailants. The

13

defendant acknowledged at trial that he was aware of his *Miranda* rights prior to confessing, including the right to remain silent, the right to an attorney, and that anything he said could be used against him. At the posttrial hearing, the defendant again acknowledged he received his *Miranda* warnings prior to talking to the police, and he did not present any testimony supporting a finding that his statements were made involuntarily. The defendant has not presented any evidence contradicting his own trial testimony indicating his statements to the police were made freely and with understanding of his *Miranda* rights. The defendant has presented no evidence suggesting that his fifth amendment rights were violated, or that the alleged error affected the fairness of his trial or challenged the integrity of the judicial process. Under the circumstances presented in this case, we find no plain error occurred.

¶ 43    Based on the foregoing, the defendant's convictions and sentences are affirmed.

¶ 44    Affirmed.