NOTICE
Decision filed 10/09/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220815-U

NO. 5-22-0815

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-674 |
| | ) | |
| MYRON LOGAN, | ) | Honorable |
| | ) | Thomas E. Griffith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction, finding that: (1) there was sufficient evidence to support defendant's conviction; (2) the State laid an adequate foundation for the admission of certain evidence; (3) trial counsel was not ineffective (a) for failing to file a motion to suppress defendant's statement to the police, the buccal swab, and the DNA evidence; (b) for failing to object to the magazine, the buccal swab, or the DNA evidence on foundational grounds; and (c) for failing to cross-examine the State's DNA expert; and (4) defendant made a knowing, understanding, and voluntary waiver of his right to a jury trial.

¶ 2    Defendant, Myron Logan, was convicted of armed violence following a bench trial in the circuit court of Macon County. On appeal, defendant raises numerous allegations of error, arguing (1) the State's evidence was insufficient to prove his guilt beyond a reasonable doubt; (2) the State failed to lay an adequate foundation for the admission of a buccal standard, a magazine for a handgun, and testimony regarding DNA evidence; (3) trial counsel was ineffective (a) for failing

to file motions to suppress certain evidence and testimony, (b) for failing to object to the foundation for the admission of the buccal standard, the magazine, and the testimony of the forensic scientist who interpreted the DNA evidence, and (c) for failing to cross-examine the State's DNA witness; and (4) the record does not demonstrate that defendant made a knowing, voluntary, and understanding waiver of his right to a jury trial. For the reasons that follow, we affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4       On June 9, 2021, defendant was charged by information with three offenses: count I, armed violence, a Class X felony, in violation of section 33A-2 of the Criminal Code of 2012 (720 ILCS 5/33A-2(a) (West 2020)); count II, aggravated fleeing or attempting to elude an officer (hereinafter, aggravated fleeing), a Class 4 felony, in violation of section 11-204.1(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11-204.1(a)(1) (West 2020)); and count III, criminal damage to property, a Class 4 felony, in violation of section 5/21-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/21-1(a)(1) (West 2020)).

¶ 5       On March 10, 2022, defendant appeared before the trial court with his attorney and waived his right to a jury trial. Defense counsel told the court that defendant was "prepared to waive jury," and that "[defendant] wants to proceed to a bench trial." In response to a question from the court, defendant confirmed that he wanted to waive his right to a jury trial. The court asked defendant whether he understood that "a jury trial is where 12 citizens from this county would hear your case, the state would have to prove these charges to the jury beyond a reasonable doubt, and the jury's verdict must be unanimous." Defendant confirmed that he understood. The court found defendant knowingly waived his right to a jury trial, noted that a written jury waiver had been filed, and that

2

the matter was "allotted for a bench trial." The court did not explain that a bench trial meant that the court would decide defendant's guilt or innocence.

¶ 6 The bench trial was held on August 18, 2022. The State called Phillipp Ganley, a patrol officer for the Decatur Police Department. Ganley testified that on May 11, 2021, he attempted to stop a silver Infinity SUV. Defendant was the driver of the vehicle. According to Ganley, the squad car was equipped with a program named the Arbitrator System, which shows not only the squad car video, but also displays the vehicle's speed and whether the emergency lights are in use. The squad car video was admitted into evidence and played for the court.

¶ 7 The video shows the squad car pulled in front of the SUV, which was parked next to a house. The squad car's emergency lights were activated. There were two people seated in the front seat of the SUV, a driver and passenger. As soon as Ganley pulled up, the SUV drove through the yard, around Ganley's squad car, and fled from the police. The video showed a high-speed pursuit through parts of Decatur, with the squad car reaching speeds in excess of 100 miles per hour as Ganley tried to catch up with the fleeing SUV. Other police cars, with their lights on, were at various locations along the route that the SUV drove while fleeing. The SUV ultimately came to a stop, and a person wearing a dark top and lighter in color pants, later identified as defendant, exited the vehicle and fled on foot. Moments after defendant exited the vehicle, the passenger also exited the vehicle, seemingly using the driver's side door to do so. The video concluded with Ganley placing defendant in the back of the squad car. Two still photos, or screen captures, taken from the Arbitrator System were entered into evidence. One photo showed a speed limit sign of 35 miles per hour in the video portion of the program and also showed that the squad car was traveling at 59 miles per hour. The second photo showed that the squad car was traveling at 115 miles per hour.

3

Ganley testified that he did not believe any roadway in Macon County had a speed limit of 80 miles per hour.

¶ 8    Zeth Giles testified that he was a police officer for the Decatur Police Department. He worked as the evidence technician. Giles testified that he received a Glock magazine, identified as People's Exhibit 3, from Detective Jason Hesse. The property evidence number for this piece of evidence was 367610. The police report number for the incident was "[r]eport number 4281 from the year '21."

¶ 9    Avery Delosh, a Decatur patrol officer, testified that on May 11, 2021, she received information that Ganley chased a subject east on Garfield Avenue in Decatur. Delosh and other officers went to the area near where the chase ended and started to search for evidence. She wore a body camera, the footage from which was later identified, admitted, and published as People's Exhibit 4. During the search of the 1800 block of east Garfield Avenue, she collected People's Exhibit 5, a Glock 23 handgun. Delosh identified the Glock as the same handgun that she collected the night of defendant's arrest. The handgun was entered into evidence without objection. A handgun magazine was found about a block east of the handgun itself. They were found on opposite sides of the road. Delosh collected the magazine and gave both it and the handgun to Officer Ganley.

¶ 10    Jeff Hockaday testified that he was a detective for the Decatur Police Department. Following defendant's arrest, Hockaday questioned defendant at the Decatur Police Department. Hockaday identified defendant in court. The interview room was audio and video recorded, and that recording was identified as People's Exhibit 6. The video was admitted without objection. The State asked to publish the video, and the circuit court granted the State permission to play "[a]t least the pertinent parts." The prosecutor informed the court that the video had been edited to give

4

the court the substance that the State wanted to present.[1] The video began with Hockaday entering the interview room and handing defendant, who was seated in the room, a blue surgical mask. Hockaday then told defendant, as he was removing the swabs for the buccal test, that before he could take defendant to the restroom, he needed to "take care of this real quick; make sure everything is good." He then swabbed the inside of defendant's mouth.

¶ 11    The video further showed that Hockaday took about seven seconds to read defendant his *Miranda* rights, concluding with, "Alright?" Defendant gave no apparent response, and Hockaday did not ask defendant whether he understood his rights. Hockaday then immediately started asking defendant biographical questions. After getting answers to the biographical questions, there was a gap in the video. When the video resumed, the substantive questioning began. Defendant told Hockaday that he did not know it was the police pursuing him. Defendant said the squad car did not have its lights on when it pulled in front of him, and he did not stop because he was worried that someone might be trying to shoot him. Hockaday cursed at defendant and told him that his story was dumb. Hockaday told defendant to be honest and asked him whose weed was in the car. When defendant asked Hockaday what he meant, Hockaday replied, "Did I stutter? Do I not speak clearly? I know I'm wearing a mask. I'll ask one more time, whose weed was in the car?" Defendant responded that he did not know. Hockaday commented that defendant claimed that he does not do drugs, and defendant offered to take a drug test.

¶ 12    Hockaday asked defendant, "You know that I took a DNA sample from you, right?" Defendant responded, "Mm hmm," and stated that he was on juvenile probation and that "they

---

[1]The running time of the video admitted at trial is 10 minutes, 18 seconds. The time stamp on the video begins at 3:54:44 a.m. and ends at 4:11:49 a.m., indicating that, at a minimum, nearly seven minutes was edited out of the video that was admitted into evidence. What occurred in the interview room before and after what appears in the exhibit, or during the nearly seven minutes that is missing from the exhibit, is not a part of the record on appeal.

already got my DNA." Hockaday told defendant that he took a fresh DNA sample to compare to the gun that was recovered. Defendant told Hockaday that he did not know about a gun. Hockaday told defendant that his brother told the police that it was defendant's gun, and defendant replied that if his brother told them that, he was lying. Hockaday told defendant that the gun "came out [defendant's] window." Defendant denied that his fingerprints and DNA would be on the gun. Defendant stated if he had a gun, he would have told the police that he had a gun and that "this my first case, first time I been doing anything as an adult." Hockaday suggested that might be why defendant's brother "was putting it on" defendant. Defendant stated that he only knew it was the police chasing him when the police put out the spikes to stop his car. Defendant told the detective that he did not know who was chasing him, and that the police should have their lights on.

¶ 13    Hockaday testified that he gave the buccal swab to Detective Jason Hesse. Hesse testified that he was a detective with the Decatur Police Department. Hesse was in charge of tagging the evidence that was collected. The Decatur Police Department case number for this incident was 21004281, with 21 being the year number and 4281 being the report number. Hesse identified both the firearm and State's Exhibit 3, the magazine. Hesse received the firearm and the magazine from Ganley, and he "believe[d]" he labeled the magazine as "bag 6" and placed it into the evidence vault. The "PR" number for the magazine was 367610; Officer Giles would have been the person to assign it that number. Hesse testified that he received the buccal swab from Hockaday. It was in "bag number 8." As he did with the magazine, Hesse labeled it, sealed it, and placed it into the evidence vault. Hesse believed he filled out the lab sheet to request the forensic testing of the evidence in this case. At the conclusion of Hesse's testimony, the judge told the prosecutor that he did not "want to make anybody's case one way or the other," "[b]ut [he had not] heard anything

6

from anyone" "[a]s to how this stuff got to Springfield and then was tested." The prosecutor replied that he would "tie everything up with the witnesses."

¶ 14 Jennifer Acosta-Talbot testified that she was a forensic scientist specializing in forensic biology and DNA analysis with the Illinois State Police. The parties stipulated that she was an expert in her field. Acosta-Talbot worked on the evidence received from the Decatur Police Department. The lab gave the evidence its own unique lab number of DFS2118328. Acosta-Talbot was responsible for testing the evidence itself, and she swabbed it for potential DNA. She identified the Glock as the firearm that she tested because the packaging had "a bar code label with the [lab's] case number and item number, and then it has [her] initials and date from when [she] took custody of it and when [she] completed her analysis." Regarding the magazine, Acosta-Talbot testified that the evidence had a "lab bar code label with the [lab's] case number, item number, the date and initials when [she] received it, [and] when [she] completed her analysis." The magazine was still sealed in a bag, and she opened the bag to verify that it contained the magazine. Acosta-Talbot's testimony regarding the buccal swab was the same. All the evidence was sealed when she received it. Acosta-Talbot swabbed the gun and the magazine for DNA evidence. She did not interpret any of the data from the evidence.

¶ 15 Dana Pitchford testified that she was a forensic scientist for the Illinois State Police, specializing in forensic biology and DNA analysis. The parties stipulated that she was an expert in her field. After DNA samples are analyzed, she interprets the evidence and reports her findings. In this matter, the evidence was assigned an Illinois State Police lab case number of DFS21018328. Regarding the firearm that was recovered, Pitchford testified that she could not do further comparisons on the two swabs taken from the firearm because there were too many contributors to the DNA.

7

¶ 16    Regarding the magazine, Pitchford testified that there were four contributors to the DNA that she was able to interpret. Of the four contributors, one person contributed approximately 62% of the DNA material. The other people contributed approximately 23%, 9%, and 6% of the DNA. Pitchford compared those samples to the known standards that were submitted to the lab. She analyzed the data with two hypotheses. One hypothesis was that the mixture of the DNA from the magazine originated from defendant and three unknown contributors. The second hypothesis was that DNA mixture from the magazine originated from four unknown contributors. By applying these two hypotheses to the data, she found "very strong support" that defendant was present as a contributor in that profile. Couched in terms of a statistical value, Pitchford found that the "DNA profile is approximately 66 sextillion times more likely to have originated from [defendant] and three unknown individuals than it *** originated from four unknown individuals." Defense counsel did not cross-examine Pitchford.

¶ 17    The State rested, and then noted that it was dismissing count III. The defense rested without presenting any evidence. After the State made its closing argument, the judge asked the State, "[I]s there some evidence that the [magazine] recovered in this case and the gun go together? I didn't hear any testimony that this particular [magazine] fit in the gun." The prosecutor told the judge that he did not present that evidence, and that it was probably an oversight on his part. After defense counsel made his closing argument, the court announced that it was going to take a brief recess: "I am the trier of fact and I want to examine the gun and the [magazine]."

¶ 18    After returning to the bench, the judge found defendant guilty of counts I and II. The court found that defendant was traveling well over 100 miles per hour during the pursuit and ran red lights. The court noted that the gun and the magazine were found about a block apart, and that there was no testimony that the two items went with one another. The court noted, however, that it

examined the evidence and found that "it's very clear to the court not only in terms of the proximity of where the gun was found that the [magazine] was found on the roadway in plain view at 1:00 in the morning, that the gun and the [magazine] go perfectly together." The court further found: "It defies logic to find otherwise so if you possess the [magazine] you also certainly possess the gun at the same time. The defendant's DNA beyond some trillionth is—is on the [magazine]. Again, there's no other reasonable explanation that the defendant possessed the gun during the course of the chase, threw the gun out of the car, the gun and the [magazine] separated, the defendant's DNA is on the [magazine], and, again, that's the basis for my finding."

¶ 19    Defendant hired new counsel to represent him on posttrial motions and at sentencing. In his motion for a new trial, posttrial counsel argued that (1) the evidence was insufficient to prove defendant guilty, (2) the trial court erred in asking questions of witnesses and of defense counsel, and (3) the court erred in taking the firearm and the magazine into chambers and "manipulating them in a way that was different from and more than the manner in which they were published as exhibits." The hearing on those two matters was held on November 10, 2022. In refuting defendant's suggestion that the court inserted the magazine into the gun, the judge explained that he looked at the gun and he looked at the magazine. He looked at their colors, their shape and size, and their make. The judge stated that he "did not conduct any independent experiment." The court denied defendant's posttrial motion.

¶ 20    The trial court found that count II, aggravated fleeing or attempting to elude an officer, merged into count I, armed violence, and proceeded to sentencing. The court sentenced defendant to the minimum sentence of 15 years in prison. Defendant filed a timely notice of appeal.

¶ 21                                   II. ANALYSIS

¶ 22     Defendant raises four issues on appeal. First, he argues that the State's evidence was insufficient to prove his guilt beyond a reasonable doubt. Second, defendant contends that the State failed to lay an adequate foundation for the admission of a buccal swab, a magazine for a handgun, and testimony regarding DNA evidence. Third, defendant argues that trial counsel was ineffective for (a) failing to file motions to suppress certain evidence and testimony; (b) failing to object to the foundation for the admission of the buccal swab, the magazine, and DNA testimony; and (c) failing to cross-examine the State's DNA witness. Finally, defendant argues that the record does not show that defendant made a knowing, voluntary, and understanding waiver of his right to a jury trial. We consider each argument in turn.

¶ 23                           A. Sufficiency of the Evidence

¶ 24     In challenging the sufficiency of the evidence, defendant advances several arguments as to why the State's evidence fell short. Defendant claims that (1) the evidence suggested that the passenger possessed the gun, (2) no one saw defendant possessing the firearm, and (3) to the extent that the evidence suggested that defendant possessed the firearm at some point in time, the evidence does not support a finding that defendant possessed the firearm while committing the offense of aggravated fleeing. We disagree and address each argument in turn.

¶ 25     In order to sustain the charge of armed violence, the State was required to prove, beyond a reasonable doubt, that defendant committed a felony under Illinois law while armed with a dangerous weapon. 720 ILCS 5/33A-2(a) (West 2020).[2] In this matter, the predicate felony offense for the armed violence charge was aggravated fleeing or attempting to elude a peace officer, in violation of section 11-204.1(a)(1). 625 ILCS 5/11-204.1(a)(1) (West 2020). We note that

_____

[2]The statute excludes certain felonies that are not pertinent to this matter.

10

defendant does not challenge the sufficiency of the evidence for the aggravated fleeing charge. Instead, defendant argues that the evidence was insufficient to prove that he was "armed with a dangerous weapon" while he was fleeing the police.

¶ 26 "A person is considered armed with a dangerous weapon *** when he or she carries on or about his or her person or is otherwise armed with a Category I, Category II, or Category III weapon." 720 ILCS 5/33A-1(c)(1) (West 2020). A person is "otherwise armed" if he or she has immediate access to or timely control over the required weapon. *People v. Smith*, 191 Ill. 2d 408, 411-12 (2000). A handgun qualifies as a "dangerous weapon." 720 ILCS 5/33A-1(c)(2) (West 2020). Neither a magazine nor ammunition qualifies as a dangerous weapon. *Id.* § 33A-1(c)(2), (c)(3).

¶ 27 "When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261." *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). The standard of reasonable doubt "does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), quoting *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 282 (1966)). Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *Collins*, 106 Ill. 2d at 261). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When

11

presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

¶ 28    This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *Campbell*, 146 Ill. 2d at 374 (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson v. Virginia*, 443 U.S. at 319). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 29    At the outset, we find that there is sufficient evidence to prove that the firearm did, in fact, come from defendant's vehicle. The State presented evidence that the firearm and the magazine were found approximately one block from each other along a roadway that defendant traversed twice, once in each direction, while fleeing from law enforcement. Although no one saw who threw the firearm from the vehicle, subsequent DNA testing established that defendant's DNA was found on the magazine. While defendant argues that Pitchford's conclusion that the "DNA profile is approximately 66 sextillion times more likely to have originated from [defendant] and three unknown individuals than it *** originated from four unknown individuals" is "facially impossible," that number was not challenged during the trial.

12

¶ 30 Defendant also argues that the DNA evidence is only associated with the magazine, and not the firearm itself. He also contends that there is little to no evidence connecting the magazine to the firearm. We disagree. Based upon the evidence, the trial court concluded that the firearm and the magazine went together based upon their (1) color, (2) make, (3) shape, (4) size, and (5) proximity to one another when discovered. This conclusion, coupled with the fact that defendant's DNA was found on the magazine, supports the court's determination that the firearm and the magazine were tossed from the vehicle as defendant fled from the police.

¶ 31 Regarding defendant's contention that "all the evidence" pointed to the passenger possessing the firearm, defendant argues that the firearm and the magazine were both found close to the curbs on the roadway, suggesting that the firearm and the magazine were both possessed by the passenger who threw them from the passenger side of the vehicle. While it is true that the firearm and the magazine were found close to the curbs, the evidence showed that they were found about a block apart, on opposite sides of the road.[3] Defendant's theory would require the fact-finder to accept the unlikely scenario that the passenger would have tossed either the firearm or the magazine out of the vehicle while they were traveling in one direction, and then throw the other object out of the vehicle in the same approximate location while traveling in the opposite direction more than two minutes later. Rather than accept defendant's theory that the firearm and the magazine were thrown from the SUV at different times during the chase, the trial court reasonably inferred that the gun and the magazine were thrown from the vehicle before becoming separated.

---

[3]Defendant argues that the distance between the firearm and the magazine was such a long distance that Officer Delosh had to drive her vehicle to get the magazine. A review of the video shows that Delosh first arrived at the magazine's location on foot. The video, which is a compilation video, then cuts to Delosh being at the back of her squad car and walking a short distance to gather the magazine from the street and place it in an evidence bag. The clear implication is that after finding the magazine on foot, Delosh went back to her squad car and drove down the street to gather the magazine as evidence.

¶ 32    Defendant also argues that it would have been "difficult, if not impossible," for him to have either thrown the firearm and the magazine or given them to the passenger to throw while driving 100 miles per hour, and that at least three other DNA profiles were found on the magazine. Defendant's arguments are speculative. The conclusions reached by the trial court are consistent with the evidence presented. A "trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70.

¶ 33    The State argues evidence of defendant's guilt can be inferred from his flight from the police. "Evidence of flight is admissible as a circumstance tending to show consciousness of guilt." *People v. Harris*, 52 Ill. 2d 558, 561 (1972). Defendant believes that the State's argument regarding flight as evidence of guilt is flawed because it uses the predicate offense of aggravated fleeing "as consciousness of guilt for armed violence when [defendant] could not have committed the armed violence without the predicate offense" of aggravated fleeing and eluding. We disagree with defendant.

¶ 34    The plain language of the armed violence statute provides that "[a] person commits armed violence when, while armed with a dangerous weapon, he commits *any* felony" defined by Illinois law that is not excepted by the statute. (Emphasis added.) 720 ILCS 5/33A-2(a). Aggravated fleeing is not one of the felonies excepted by the statute. Further, we agree with the State that the trial court could have inferred that defendant was fleeing to rid himself of the firearm. Although defendant argues that the State does not explain how the gun and the magazine were incriminating prior to defendant's decision to flee the police at speeds in excess of 100 miles per hour, we note that defendant admitted during his statement to the police that he was on probation. Regardless of

14

whether defendant's probation specifically prohibited his possession of a firearm, defendant may well have believed that he would be in trouble for possessing the firearm.

¶ 35    Defendant also argues that the evidence likewise fails to support a finding that defendant was "otherwise armed" with the firearm. As noted above, a person is "otherwise armed" if he or she has immediate access to or timely control over the required weapon. *Smith*, 191 Ill. 2d at 411-12. Defendant argues that the evidence at trial only supports the fact that someone tossed the firearm out of defendant's vehicle and does not prove who tossed the firearm or where the firearm was located in the vehicle, and that mere constructive possession is not enough to convict him, relying upon *People v. Condon*, 148 Ill. 2d 96 (1992).

¶ 36    In *Condon*, the defendant was in the kitchen when the police entered the home to execute a search warrant. *Id.* at 101. Two unloaded guns were found in a first-floor bedroom, and 11 other guns were found in various rooms on the second floor. *Id.* at 102. The Illinois Supreme Court found that defendant was not "otherwise armed" for the purposes of the armed violence statute. *Id.* at 109. Noting that "[a] felon with a weapon at his or her disposal is forced to make a spontaneous and often instantaneous decision to kill without time to reflect on the use of such deadly force," and that "[w]ithout a weapon at hand, the felon is not faced with such a deadly decision," the *Condon* court found that the purpose of the statute is served only if the defendant has "some type of *immediate access to* or *timely control over* the weapon." (Emphases in original.) *Id.* at 109-10. Finding that the defendant did not have the "capability to maintain control and possession of guns that were not even in the same room with him," the court found that the defendant was not "otherwise armed" for the purposes of the armed violence statute. *Id.* at 112.

¶ 37   Defendant's reliance on *Condon* is misplaced. In contrast to the defendant in *Condon*, here, defendant had immediate access to the firearm in his vehicle. We agree with the State that this case is more akin to *People v. Harre*, 155 Ill. 2d 392 (1993).

¶ 38   In *Harre*, the defendant sat on the passenger side hood of a car. *Id.* at 395. The defendant jumped off the hood and took two steps toward the rear of the car until he was near the passenger side window which was a little more than halfway down. *Id.* The police recovered two firearms, a pistol that was next to the driver's right leg, and a rifle that was pointed down toward the floorboard of the passenger side of the car, with the butt in the middle of the seat and angled toward the driver. *Id.* The defendant was convicted of armed violence, and the defendant appealed. The appellate court reversed defendant's conviction, finding, in reliance on *Condon*, that the defendant was not armed at the time of his arrest. *Id.* at 393. The Illinois Supreme Court reversed the appellate court and affirmed the defendant's conviction, finding that the jury's "factual determination that defendant was armed was supported by the testimony of two officers that the weapons on the front seat of the car were within defendant's immediate reach as defendant stood next to the car door and the partially opened window." *Id.* at 396.

¶ 39   Defendant attempts to distinguish *Harre* based on the fact that the defendant therein had immediate access and control of the firearms, but that the same cannot be said in this case since the State presented no evidence as to the actual location of the firearm within the vehicle during the police chase. Defendant's argument belies common sense. As noted above, there is sufficient evidence to support the conclusion that the firearm was present in the car during the chase prior to being thrown from the car. The evidence also demonstrates that only one person other than defendant was present in the vehicle, and that was the front seat passenger. This is not a case where the firearm was in the trunk or the backseat of the car. See *People v. Melgoza*, 231 Ill. App. 3d 510

16

(1992) (conviction for armed violence overturned where the evidence showed the gun was in the backseat or the trunk of the car and the State did not show the firearm was readily accessible and within the defendant's reach). Here, similar to *Harre*, the firearm must have been in the front seat of the vehicle at the time that it was tossed onto the roadway. Given the close quarters of the front seat of any vehicle, it was entirely reasonable to the court to infer that the firearm was readily accessible and within defendant's reach during the high-speed chase.

¶ 40    We also agree with the State that the evidence in the matter would support a finding of joint possession of the firearm. "Mere proximity is not sufficient evidence of actual possession [citation], and knowledge of the location of contraband is not the equivalent of possession but merely a necessary element of criminal possession [citation]." *Schmalz*, 194 Ill. 2d at 81. "Actual possession is the exercise by the defendant of personal dominion over the illicit material [citation] and exists when an individual exercises immediate and exclusive dominion or control over the illicit material [citation]." *Id.* at 82. "Actual possession does not require present personal touching of the illicit material but, rather, present personal dominion over it." *Id.* "The rule that possession must be exclusive does not mean that the possession may not be joint [citation]; if two or more persons share immediate and exclusive control or share the intention and power to exercise control, then each has possession [citation]." *Id.* "Where possession has been shown, an inference of guilty knowledge can be drawn from the surrounding facts and circumstances." *Id.*

¶ 41    In its simplest terms, the evidence at trial established that defendant was the driver of a vehicle that fled from the police at speeds in excess of 100 miles per hour. Only two people were present in the vehicle at the time of the offense, and both were seated in the front. A firearm was recovered in the roadway along the route that defendant drove while fleeing from the police. A magazine matching the firearm was recovered on the same road about a block away from the

firearm. According to the Illinois State Police forensic scientist, there was "very strong support" that defendant was a contributor to the DNA profile taken from the magazine. Viewing this evidence in the light most favorable to the State, there was sufficient proof that defendant was guilty of armed violence beyond a reasonable doubt.

¶ 42                                    B. Foundational Claims of Error

¶ 43    Defendant next argues that the State failed to lay a sufficient foundation for the admission of the buccal swab, the magazine, and the testimony regarding the DNA analysis. Specifically, defendant complains that (1) there was no testimony at trial that the magazine entered into evidence was the same magazine that police recovered on the night of the offense, (2) there was no testimony that the buccal swab and the magazine were in the same condition as they were when they were recovered by the police, and (3) there was a break in the chain of custody for both the buccal swab and the magazine due to the fact that no evidence established that the magazine recovered from the street and the buccal swab taken from defendant were the same items tested at the Illinois State Police forensic laboratory. The State argues that these claims of error are forfeited, because defense counsel did not object to the admission of this evidence, and that the admission of the evidence was not raised in defendant's posttrial motion. We agree with the State that defendant forfeited the foundational issues on appeal. Defendant acknowledges that the issues were not preserved for appeal, but asks us to review the matter as plain error.

¶ 44    "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). "If a defendant fails to satisfy either prong of this test, his challenge is considered waived on appeal." *Id.* (citing *Enoch*, 122 Ill. 2d at 186). "This rule is particularly appropriate when a defendant argues that the State failed to

18

lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State the opportunity to correct any deficiency in the foundational proof at the trial level." *Id.* (citing *People v. Rodriguez*, 313 Ill. App. 3d 877, 887 (2000), and *People v. Bynum*, 257 Ill. App. 3d 502, 514 (1994)). There are limited circumstances under which a challenge to the chain of custody may be raised on appeal as plain error. *Id.* at 471.

¶ 45    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) memorializes the plain-error doctrine:

> "Any error, defect, irregularity, or variance which does not affect substantial rights
>
> shall be disregarded. Plain errors or defects affecting substantial rights may be
>
> noticed although they were not brought to the attention of the trial court."

The plain-error doctrine does not create a "general saving clause" to allow defendants to escape the consequences of their nonfeasance. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Instead, it offers a narrow exception to the rule of procedural default for unpreserved errors. *Jackson*, 2020 IL 124112, ¶ 81. Whether there is plain error is a question of law, which we review *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 46    "[T]he defendant cannot obtain relief on an unpreserved error under the plain-error doctrine if he would not have been entitled to relief on the same error if preserved." *People v. Williams*, 2022 IL 126918, ¶ 49. The Illinois Supreme Court has identified two instances in which a reviewing court can consider a forfeited but still clear and obvious error: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the

closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87). The initial step under either prong of the plain-error doctrine is to determine whether there was a clear or obvious error at trial. *Id*. Therefore, the "the threshold inquiry is whether there was an error at all." *Williams*, 2022 IL 126918, ¶ 49 (citing *Jackson*, 2020 IL 124112, ¶ 81). Here, defendant seeks review under the first prong of the plain-error doctrine.

¶ 47    "When the State seeks to introduce an object into evidence, the State must lay an adequate foundation either 'through its identification by witnesses or through chain of possession.' " *Woods*, 214 Ill. 2d at 466 (quoting *People v. Stewart*, 105 Ill. 2d 22, 59 (1984)). "The character of the item sought to be introduced into evidence determines which method of establishing a foundation must be employed." *Id.* "For example, where an item has readily identifiable and unique characteristics, and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and is in substantially the same condition as when it was recovered." *Id.* However, if the evidence is "not readily identifiable or may be susceptible to tampering, contamination or exchange," then the State is required to establish a chain of custody "that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." *Id.* at 467. This requires the State to "show that the police took reasonable protective measures to ensure that the [evidence] recovered from the defendant was the same [evidence] tested by the forensic [scientist]." *Id.* "Unless the defendant produces actual evidence of actual tampering, substitution or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination." *Id.* "[T]he State must demonstrate, however, that reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Id.*

¶ 48    " 'Once the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence.' " *Id.* (quoting *Bynum*, 257 Ill. App. 3d 510). "Even where the chain of custody has a missing link, 'trial courts have properly admitted evidence where there was testimony which sufficiently described the condition of the evidence when delivered which matched the description of the evidence when examined.' " *Id.* at 467-68 (quoting *Bynum*, 257 Ill. App. 3d at 510). "The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *People v. Brand*, 2021 IL 125945, ¶ 36. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position." *Id.*

¶ 49    As noted above, there are limited circumstances under which a challenge to the chain of custody may be raised on appeal as plain error. *Woods*, 214 Ill. 2d at 471. This includes "those rare instances where a complete breakdown in the chain of custody occurs *** raising the possibility that the evidence sought to be introduced at trial was not the same [evidence] recovered from the defendant." *Id.* As the *Woods* court explained, "[w]hen there is a *complete failure* of proof, there is *no link* between the [evidence] tested by the [forensic scientist] and the [evidence] recovered at the time of the defendant's arrest." (Emphases added.) *Id.* at 472. Defendant contends that there is a complete failure of proof in the chain of custody, arguing that there is no evidence that the magazine and the buccal standard taken from defendant ever "left the locker to go to the crime lab, let alone who took the items out and took them to the crime lab." We disagree.

¶ 50    A review of the record demonstrates that the State took reasonable protective measures to ensure that both the magazine and the buccal swab recovered by the police were the same items

that were subject to testing in the crime lab. The record also establishes that the State presented a sufficient chain of custody for these two pieces of evidence. Regarding the magazine, the evidence showed that Officer Delosh recovered the magazine, placed it in a paper bag, and placed it into the back of her squad car. She testified that she gave the evidence to Officer Ganley. Although Ganley testified at trial, he was not asked whether Delosh gave him the evidence she had recovered.

¶ 51    Regarding the buccal swabs, the evidence at trial established that Hockaday took the swabs from defendant and placed them into a box and then placed the box into an envelope that had defendant's name on the exterior. Hockaday testified that he gave this evidence to Detective Hesse. Hesse testified that he received the gun and magazine from Ganley at police headquarters. He filled out a voucher, and he "believed" that he labeled the magazine as "bag 6." The magazine was placed into the evidence vault. Hesse also testified that he received the buccal standard from Hockaday, and that he "labelled it, sealed it, and placed it into the evidence locker." He described the evidence tag as containing the Decatur Police Department's case number of 21004281, a property report number of 367610, and his name. Hesse "believed" that he filled out the request for the forensic testing for the evidence in this matter. For a case like this, Hesse would have requested that the magazine and the firearm be tested for fingerprints and DNA, and that they be compared to the known standards that he submitted from the defendant.

¶ 52    Acosta-Talbot from the crime lab testified that she received this evidence in this matter and was assigned to work on its analysis. Although her testimony did not include mention of either the Decatur Police Department's case number or the property numbers, she testified that the evidence was sealed at the time that she received it. The evidence was assigned a unique lab number: DFS2118328. Acosta-Talbot identified the firearm and the magazine as the evidence that she swabbed for DNA testing. Regarding the magazine, she identified it in court as the same magazine

22

that she tested at the lab. She made the identification by the lab number, the date, and her initials from when she received it and from when she tested it. At trial, the magazine was still in a sealed condition with evidence tape from both the Decatur Police Department and the crime lab. The evidence was opened to demonstrate that the evidence bag contained the magazine. Acosta-Talbot's testimony regarding the buccal standards taken from defendant was the same: the evidence contained the lab number, her initials from the date that she received the evidence and from when she finished her analysis. The evidence was labeled as a buccal standard from defendant. The buccal swabs were still sealed, closed with tape from the Decatur Police Department and the lab. Acosta-Talbot conducted the testing that generated the DNA profiles that were then analyzed by Dana Pitchford as containing "very strong support" that defendant contributed to the DNA on the magazine.

¶ 53    Notwithstanding defendant's forfeiture of this issue, defendant's argument of plain error fails. As noted by the Illinois Supreme Court, it is not erroneous to admit evidence "[e]ven where the chain of custody has a missing link" if " 'there was testimony which sufficiently described the condition of the evidence when delivered [to the crime lab] which matched the description of the evidence when examined.' " *Woods*, 214 Ill. 2d at 467-68 (quoting *Bynum*, 257 Ill. App. 3d at 510). Hesse's testimony established the magazine and the buccal standard were both sealed when they were placed into the evidence locker. Acosta-Talbot's testimony verified that, when she received the evidence, the magazine and the buccal standard were each sealed by a single piece of evidence tape from the Decatur Police Department. Thus, her testimony was consistent with Hesse's testimony regarding the condition of the evidence when it was placed into the evidence vault.

23

¶ 54    Under the facts of this case, we see no reason for concluding that the significant point in time for determining the condition of the evidence is its condition when it arrived at the crime lab. So long as the testimony describing the condition of the evidence when tested is consistent with the condition of the evidence when it was placed into the evidence vault, then the State has demonstrated that "the police took reasonable protective measures to ensure that the [evidence] recovered from the defendant was the same [evidence] tested" at the lab. *Id.* at 467. The State's burden only requires it to demonstrate a reasonable probability that the evidence was not subject to tampering or accidental substitution (*id.*), and the State met its burden here. Although it would have been preferable for the State to elicit direct testimony from members of Decatur Police Department that the magazine and the buccal standard were substantially in the same condition as when they collected the evidence, and for the State to have elicited testimony from Acosta-Talbot regarding the police report number and the property report number for each piece of evidence, this is not one of "those rare instances where a complete breakdown in the chain of custody" has occurred. *Id.* at 471. Indeed, this case is a perfect example of why a defendant must make a contemporaneous objection to any perceived foundational errors during a trial or risk forfeiture: the deficiencies defendant complains of could have been easily remedied by the State at that time.

¶ 55    Since the State made a *prima facie* showing that the chain of custody was sufficiently complete, the defendant has the burden to produce evidence of actual tampering, alteration or substitution. *Id.* at 468. Defendant makes no such argument here. Since the State has established the probability that the evidence was not compromised, any deficiency in the chain of custody goes to the weight of the evidence, and not its admissibility. *Id.* at 467. "Whether to admit physical evidence at trial lies within the discretion of the trial court ***." *People v. Irpino*, 122 Ill. App. 3d 767, 773 (1984).

24

¶ 56    Having found that the evidence in this matter establishes (1) a sufficiently complete chain of custody, (2) that the magazine tested at the lab and admitted at trial was the same magazine that was recovered by law enforcement, and (3) that the magazine and the buccal standard were in substantially the same condition when they were tested as they were when they were seized, we conclude that the trial court did not err or abuse its discretion in admitting the evidence. Finding no reversible error, there can be no plain error. *People v. McDonald*, 2016 IL 118882, ¶ 48.

¶ 57                    C. Ineffective Assistance of Counsel

¶ 58    Defendant next claims that his trial counsel was ineffective for several reasons. First, defendant claims that the buccal swab taken from defendant was an illegal search and alleges that counsel was ineffective for failing to file a motion to suppress the buccal swab and the results of the DNA testing. Second, defendant alleges his statement to the police was not knowing and voluntary, and that trial counsel was ineffective for failing to file a motion to suppress the statement. Third, defendant argues that, in the absence of plain error, defense counsel was ineffective for failing to object to the admissibility of the magazine, the buccal swab, and the DNA testimony on foundational grounds. Finally, defendant alleges that trial counsel was ineffective for failing to cross-examine the forensic scientist regarding her assertion as to the accuracy of the DNA testing. For the reasons that follow, we disagree.

¶ 59    "A criminal defendant has a constitutional right to effective assistance of counsel." *People v. Veach*, 2017 IL 120649, ¶ 29 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). "A claim alleging ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Id.* " 'To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant.' " *Id.* ¶ 30 (quoting *People v. Domagala*,

25

2013 IL 113688, ¶ 36). "Specifically, 'a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " *Id.* (quoting *Domagala*, 2013 IL 113688, ¶ 36, quoting *Strickland*, 466 U.S. at 687). When considering an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). " 'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' " *Veach*, 2017 IL 120649, ¶ 30 (quoting *People v. Simpson*, 2015 IL 116512, ¶ 35).

¶ 60    We first address defendant's claim that counsel was ineffective for failing to file a motion to suppress the buccal standard and the DNA evidence. Defendant argues the taking of his DNA standard by Hockaday was an illegal search of the defendant and that the results of the DNA testing and the testimony regarding the same is the fruit of the poisonous tree. Defendant contends that a motion to suppress this evidence would have been meritorious, and because the DNA evidence was the critical piece of evidence linking defendant to the magazine and the firearm, trial counsel was ineffective for failing to file such a motion. We disagree.

¶ 61    "A compelled DNA extraction undeniably constitutes a search under the fourth amendment to the federal constitution (U.S. Const., amend. IV) and the search-and-seizure provision of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) and, as such, generally requires a warrant due to the inherent interest an individual possesses in his privacy and bodily integrity."

26

*People v. Ealy*, 2015 IL App (2d) 131106, ¶ 34 (citing *People v. Garvin*, 219 Ill. 2d 104, 117 (2006)). The decision whether to file a motion to suppress "is generally a matter of trial strategy, which is entitled to great deference." (Internal quotation marks omitted.) *People v. Gayden*, 2020 IL 123505, ¶ 28. "[W]here an ineffectiveness claim is based on counsel's failure to file a suppression motion, in order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. " 'A reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *Veach*, 2017 IL 120649, ¶ 30 (quoting *Simpson*, 2015 IL 116512, ¶ 35). "The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 62    The evidence at trial regarding the taking of the buccal swab was limited to the video, which shows that defendant was seated in the interview room when Hockaday entered, and Hockaday stood in the only doorway to the room and said that he "needed to take care of this real quick" prior to swabbing the inside of defendant's cheeks. Defendant concludes that this evidence, along with the fact that there was no testimony that Hockaday had a warrant to take the swabs, demonstrates that defendant was compelled to allow Hockaday to swab his cheeks. Defendant's claim is a conclusion unsupported by the evidence in the record.

¶ 63    "Compel" means "[t]o cause or bring about by force, threats, or overwhelming pressure." Black's Law Dictionary (12th ed. 2024). There is no record of what happened in the interview room prior to the collection of the buccal standard, and therefore, there is nothing in the record to support defendant's claim that he was forced, threatened, or subjected to overwhelming pressure

27

to allow Hockaday to take the swabs. In the absence of any such evidence, we cannot say that counsel was ineffective.

¶ 64 Moreover, there are many strategic reasons why counsel may have foregone a motion to suppress. For example, trial counsel may have known from his review of all the discovery that defendant consented to having his DNA tested. Alternatively, defense counsel could have concluded that there were other avenues by which the State would have secured defendant's DNA, and that the admission of this evidence was ultimately inevitable. As noted above, due to defendant's prior juvenile adjudication, the State already had defendant's DNA. Therefore, the DNA found on the magazine during testing at the lab would have led to a "hit" in the Illinois State Police database for defendant. At that point, the State could have sought a court order requiring defendant to submit to the taking "of his blood, hair and other materials of his body which involve no unreasonable intrusion thereof." Ill. S. Ct. R. 413(a)(vii) (eff. July 1, 1982).

¶ 65 Nothing in the record supports defendant's claim that trial counsel's performance fell below an objective standard of reasonableness for failing to file a motion to suppress the buccal standard. Furthermore, the record supports a finding that, even if trial counsel filed and succeeded on a motion to suppress the buccal standard, the State had an alternative avenue for securing this evidence for trial. Accordingly, defendant cannot prove prejudice from the admission of this evidence. For these reasons, the record before this court does not support a claim of ineffective assistance of counsel for trial counsel's failure to file a motion to suppress the buccal standard and the DNA evidence.

¶ 66 Next, we consider whether trial counsel was ineffective for failing to file a motion to suppress defendant's statement to Hockaday. Defendant contends that a motion to suppress his statement would have been meritorious because (1) Hockaday treated the *Miranda* warnings as

28

"preliminary ritual" by reading them at a high rate of speed, (2) Hockaday started questioning defendant immediately thereafter without giving defendant an opportunity to consider his rights, and (3) defendant's prior contact with the police was limited to one prior juvenile matter and that although defendant graduated high school, he had fallen behind while in school. Under these facts, defendant argues that he did not knowingly and intelligently waive his rights, and counsel was ineffective for failing to raise the issue in a pretrial motion. We disagree.

¶ 67 Under the fifth amendment of the United States Constitution, which applies to the state through the fourteenth amendment (*People v. Hunt*, 2012 IL 111089, ¶ 23), "[n]o person shall *** be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Prior to a custodial interrogation, a defendant must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.*

¶ 68 "Before a defendant's confession can be admitted at trial, the State must prove by a preponderance of the evidence that the defendant validly waived his or her privilege against self-incrimination and his or her right to counsel." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 24 (citing *In re W.C.*, 167 Ill. 2d 307, 327 (1995)). "[A] defendant's waiver of *Miranda* rights must be knowing and intelligent, which means it must reflect an intentional relinquishment or abandonment of a known right or privilege." *Id.* (citing *People v. Braggs*, 209 Ill. 2d 492, 514 (2003)). "The mental state necessary to validly waive *Miranda* rights involves being aware at all times of not

29

only the State's intention to use one's statements to secure a conviction, but also the fact that one can stand mute and request a lawyer." *Id.* (citing *In re W.C.*, 167 Ill. 2d at 328).

¶ 69 There is no formal procedure for waiving *Miranda* rights. *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010). The State does not have to show an express waiver of *Miranda* rights. *Id.* "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' " *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The giving of a *Miranda* warning and the defendant's uncoerced statement alone are insufficient to establish a waiver. *Id.* at 384. The State must also show the accused understood his rights. *Id.*

¶ 70 "The critical test used in determining whether an accused knowingly and intelligently waived his or her rights is whether the words in the context used, considering the age, background, and intelligence of the individual being interrogated, convey a clear and understandable warning of all his or her rights." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 25 (citing *In re W.C.*, 167 Ill. 2d at 329). "To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *In re W.C.*, 167 Ill. 2d at 328. "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of each case, including the defendant's background, experience, and conduct." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 25 (citing *Braggs*, 209 Ill. 2d at 515). "To determine the voluntariness of a confession, courts consider the totality of the circumstances, including such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of the questioning." *People v. Murdock*, 2012 IL 112362, ¶ 30. The record demonstrates that defendant was a high school graduate. There is nothing to suggest that defendant had any kind of learning disability that would have impacted his ability to

understand the *Miranda* rights that were given to him, and indeed, the presentence investigation indicates that defendant denied having "any known learning disabilities" and that "he was never enrolled in special education." Although defendant argues that he fell behind while in high school, the record reflects that defendant fell behind when he was being held in detention as a juvenile. Defendant told Hockaday that had he possessed a firearm, he would have admitted it due to the fact that this was the first time that he had been arrested as an adult. This demonstrates defendant had some knowledge as to the workings of our criminal justice system. Defendant has had previous, albeit limited, contact with the criminal justice system as a juvenile, and was still on probation at the time of the offense and the interview. Defendant appeared comfortable during the interview, joking about his height with Hockaday. Significantly, although defendant admitted to being the driver of the vehicle, he denied any knowledge of the marijuana that was apparently found, and most importantly, denied any knowledge of the firearm.

¶ 71     Although the purpose of *Miranda* warnings "is to ensure that the accused is aware of his substantive constitutional right not to incriminate himself and to provide him with the opportunity to exercise that right" (*People v. Winsett*, 153 Ill. 2d 335, 348 (1992)), defendant offers no authority for the proposition that a specific period of time must pass between the *Miranda* warnings and the onset of questioning. While the video did not show that defendant was affirmatively asked whether he understood his rights, defendant proceeded to answer Hockaday's questions.

¶ 72     Taking into consideration the particular facts and circumstances of this case, including the defendant's background, experience, and conduct, we find that the record before this court demonstrates that defendant understood what his *Miranda* rights encompassed and what their waiver entailed. Indeed, there is nothing in the record to indicate that defendant did not understand his rights when he chose to participate in the interview. Based upon this record, we cannot find

31

that defendant has overcome the strong presumption that trial counsel decided to forgo a motion to suppress as a matter of trial strategy. Regarding prejudice, as noted above, defendant made no admission regarding the firearm. Although defendant admitted that he was the driver of the motor vehicle, Officer Ganley identified defendant as the driver of the SUV and testified to this fact, making defendant's admission cumulative to eyewitness testimony. We cannot conclude that a motion to suppress defendant's statement to Hockaday would have been either meritorious or that a reasonable probability exists that the outcome of the trial would have been different. *Henderson*, 2013 IL 114040, ¶ 15. Accordingly, we find that defendant has failed to meet either prong of *Strickland*.

¶ 73 Third, defendant argues that trial counsel provided ineffective assistance for failing to object to lack of foundation for the magazine, the buccal swabs, and the DNA testimony. Given our conclusion that this evidence was properly admitted, we find that counsel could not be ineffective for failing to raise objections to this evidence. *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection.").

¶ 74 Finally, defendant argues that trial counsel was ineffective for failing to cross-examine Dana Pitchford's testimony that she found "very strong support" that defendant was a contributor to the DNA on the magazine, and in particular, that the "DNA profile is approximately 66 sextillion times more like to have originated from [defendant] and three unknown individuals than it *** originated from four unknown individuals." Defendant contends that Pitchford's statistical probabilities are unfathomable, and since the DNA evidence on the magazine was the key evidence tying defendant to the firearm, there is a reasonable probability that the outcome of the trial would have been different had Pitchford been cross-examined. The State counters that trial counsel's

decision regarding whether to cross-examine Pitchford is a matter of trial strategy and cannot sustain defendant's claim of ineffective assistance. Generally, the decision whether to cross-examine or impeach a witness is a matter of trial strategy which does not support a claim of ineffective assistance of counsel. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Id.* at 326-27.

¶ 75    In support of his argument, defendant relies on *People v. Watson*, 2012 IL App (2d) 091328. In *Watson*, the defendant was convicted of residential burglary following a jury trial. *Id.* ¶ 1. The evidence established that a home had been burglarized, and that entry had been made through a window that had been broken and pried open. *Id.* ¶ 5. The police recovered a screwdriver they believed was used to enter the home, and some small hairs that were found on the broken glass. *Id.* No useable fingerprints were recovered. *Id.* A footwear impression was found on the toilet seat underneath the window where entry was made into the home, but a lift of that impression was not tied to the defendant. *Id.* The screwdriver and the hairs were sent to the Illinois State Police crime lab for DNA testing. *Id.* The defendant apparently became a suspect as the result of a "hit" in the State's DNA database for convicted felons. *Id.* ¶ 13. At trial, the forensic scientist testified that the crime lab types 13 loci on a DNA sample in order to create a profile, and that buccal swabs taken from individuals typically contain full 13-loci DNA profiles. *Id.* ¶ 7. He also testified that "it is not expected that full profiles will be recovered from samples left at crime scenes." *Id.* The DNA evidence recovered from the window at the crime scene was not a full profile; the scientist was only able to obtain information from only 7 of the 13 loci. *Id.* ¶ 9. Based upon this partial match, the forensic scientist found that the defendant could not be excluded as a contributor to the DNA recovered from the window. *Id.* ¶ 10. Because the missing DNA evidence (from the other six loci)

33

could have excluded the defendant as being the person who committed the burglary, the *Watson* court reversed the defendant's conviction, finding that trial counsel was ineffective for failing to point out through either cross-examination or argument to the jury that the lack of a complete DNA sample was critical. *Id.* ¶ 26. After noting some studies of DNA databases and matching DNA profiles based on fewer than 13 loci, as well as the questioning of the reliability of the "extraordinarily large" numbers often used in court to describe the statistical probabilities of a DNA match, the *Watson* court opined that "a reasonably effective defense attorney confronted with the circumstances of defendant's trial would, in some capacity, argue that a DNA comparison based on fewer than 13 loci might be unreliable or that the partial profile recovered might not be uncommon." *Id.* ¶ 31.

¶ 76    Defendant's reliance on *Watson* is problematic for two reasons. First, in *Watson*, the DNA was the *only* evidence linking the defendant to the crime. Here, defendant was identified by the police as the person who led them on a high-speed chase, and the firearm and magazine were located within relative proximity to one another along the route defendant took while fleeing. Second, in *Watson*, the evidence that linked the defendant to the crime was established only through the use of a *partial* DNA profile. The record here does not indicate whether the DNA profile obtained from the magazine was a full profile or a partial profile. Any attempt to determine whether trial counsel's failure to cross-examine Pitchford was objectively unreasonable, or whether the defendant suffered prejudice because of this failure, would require us to engage in speculation, which is an insufficient basis for a finding of ineffectiveness.

¶ 77                                    D. Jury Waiver

¶ 78    Finally, defendant argues that the trial court violated his constitutional right to a jury trial by accepting his jury waiver without first ensuring that the waiver was knowingly, voluntarily, and

understandingly made. Specifically, defendant argues that nothing in the records establishes that he understood that a bench trial meant that the judge would determine the facts of the case. The State argues that defendant has forfeited this issue for neither objecting to a bench trial nor raising the issue in his posttrial motion. See *Enoch*, 122 Ill. 2d at 186. Defendant acknowledges that this issue was not properly preserved for appeal, but again asks us to review the matter as plain error.

¶ 79     As noted above, the court can "review unpreserved plain errors affecting substantial rights in two limited circumstances: (1) when the evidence is closely balanced or (2) when the error was so serious that it denied the defendant a fair and impartial trial." *People v. Hutt*, 2023 IL 128170, ¶ 28 (citing *People v. Bannister*, 232 Ill. 2d 52, 65 (2008)). " 'Whether a defendant's fundamental right to a jury trial has been violated is a matter that may be considered under the plain error rule.' " *Id.* (quoting *People v. Bracey*, 213 Ill. 2d 265, 270 (2004)). "The first step in the plain error analysis is to determine whether any error occurred, *i.e.*, whether defendant's fundamental right to a jury trial has been violated." *Id.* ¶ 29 (citing *Bannister*, 232 Ill. 2d at 65). Again, if there was no error, there can be no plain error. *McDonald*, 2016 IL 118882, ¶ 48. The State contends that there was no error.

¶ 80     The right to a jury trial in criminal prosecutions is guaranteed by the Illinois Constitution. Ill. Const. 1970, art. I, § 8. "A defendant may waive his right to a jury trial, but for a valid jury waiver, the trial court must ensure the waiver was knowing and understanding." *Hutt*, 2023 IL 128170, ¶ 30 (citing *Bracey*, 213 Ill. 2d at 269, and 725 ILCS 5/103-6 (West 2016)). "Whether a waiver is knowing and understanding depends on the particular facts and circumstances of each case." *Id.* (citing *Bracey*, 213 Ill. 2d at 269). " 'Generally, a jury waiver is valid if it is made by defense counsel in defendant's presence in open court, without an objection by defendant.' " *Id.* (quoting *Bracey*, 213 Ill. 2d at 270). "[A] trial court need not give any specific admonition or

advice for a defendant to make an effective jury waiver." *Bannister*, 232 Ill. 2d at 66. "The determination of whether a jury waiver is valid cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case." *Id.* "If the facts are not in question, the issue of whether defendant knowingly waived his right to a jury trial is a question of law that we review *de novo*." *Hutt*, 2023 IL 128170, ¶ 30 (citing *Bracey*, 213 Ill. 2d at 270).

¶ 81     Here, it is undisputed that defendant was present in court when trial counsel informed the trial court that defendant was prepared to waive his right to a jury trial and that defendant wanted to proceed with a bench trial. When the court asked defendant whether this was correct, he responded in the affirmative. The court confirmed defendant understood that a jury trial meant that the State would have to prove his guilt beyond a reasonable doubt to 12 jurors, and that the jury verdict would have to be unanimous. The court also confirmed that defendant wanted "a bench trial or some other resolution of [his] case other than a jury trial," and noted that the record contains a written jury waiver signed by defendant. Defendant contends that this is not enough to demonstrate a knowing and understanding waiver of his right to a jury trial. The focus of defendant's argument is that the court did not specifically tell him that a bench trial would mean that the case would be decided by the judge, and the absence of this information from the record means that defendant's waiver was not knowing and understanding. See *Bannister*, 232 Ill. 2d at 69 ("When a defendant waives the right to a jury trial, the pivotal knowledge that the defendant must understand—with its attendant consequences—is that the facts of the case will be determined by a judge and not a jury.").

¶ 82     As noted above, however, "a trial court need not give any specific admonition or advice for a defendant to make an effective jury waiver." *Id.* at 66. Because a defendant generally speaks through his attorney, the Illinois Supreme Court has "given effect to jury waivers made by defense

36

counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case." *People v. Frey*, 103 Ill. 2d 327, 332 (1984) (and see cases cited therein). In the instant matter, defendant appeared in court and confirmed that he wanted to waive his right to a jury trial, and to have "a bench trial or some other resolution" to his case. He executed a written jury waiver. Defendant appeared in court on at least two other occasions prior to the actual bench trial, and at each of those hearings the parties and the trial court discussed the scheduling of the bench trial. The defendant failed to object either time. Defendant appeared for the bench trial and did not object to moving forward with the evidence.

¶ 83    Notwithstanding defendant's forfeiture of this issue, considering the particular facts and circumstances of this case, we find that the defendant's waiver of his right to a jury trial was knowing and understanding. Although the record does not reflect that the court explained that a bench trial meant that the court would decide the facts of the case, there is nothing in the record to suggest that defendant failed to understand what a bench trial entailed. Other than the absence of this explanation, there is nothing in the record to support defendant's contention that his waiver was not knowing and understanding. Defendant was told that he had the right to a jury trial and what that right entailed. The record demonstrates that defendant understood that he was not going to have a trial by jury.

¶ 84    Although defendant's prior contact with the criminal justice system was limited to a single juvenile matter, defendant did not suffer from any learning disabilities or mental impairments and graduated high school. We would further note that defendant was represented by trial counsel at the time of his waiver, and that defendant hired new counsel to file his posttrial motions and to handle his sentencing hearing. The record reflects that posttrial counsel reviewed the record. Yet, this issue is now being raised for the first time on appeal. We find the trial court's admonishment

and defendant's actions were sufficient to waive his right to a jury trial. Because there is no error, there can be no plain error. *Hutt*, 2023 IL 128170, ¶ 37.

¶ 85                                  III. CONCLUSION

¶ 86     Based upon a review of the entire record, we find that the evidence was sufficient to convict defendant of armed violence. Additionally, despite defendant's forfeiture of the issues he raises related to foundation, we conclude that the State laid an adequate foundation for the admission of the buccal swab, the firearm magazine, and the DNA analysis testimony. Moreover, trial counsel was not ineffective for (1) failing to file a motion to suppress defendant's statement to the police, the buccal swab, and the DNA evidence; (2) failing to object to the magazine, the buccal swab, or the DNA evidence on foundational grounds; and (3) failing to cross-examine the State's DNA expert. Finally, notwithstanding defendant's forfeiture of the issue, we find that defendant's waiver of his right to a jury trial was knowing, voluntary, and understanding.

¶ 87     For the foregoing reasons, the judgment of the circuit court of Macon County is affirmed.

¶ 88     Affirmed.